22-2393

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

TYLER A. MONTOUR
     (now known as Tyler A. Gonzales),

     *Petitioner-Appellant*,

     v.

CHERYL EPLETT,

     *Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Eastern District of Wisconsin,
Case No. 1:19-CV-01604-WCG
The Honorable William C. Griesbach, Presiding

_____

**OPENING BRIEF AND SHORT APPENDIX OF
DEFENDANT-APPELLANT TYLER A. MONTOUR**

_____

Jessica Arden Ettinger
    *Counsel of Record*
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, WI  53703
(608) 260-9900
jessica_ettinger@fd.org

*Counsel for Tyler A. Montour*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, undersigned counsel informs the Court that Federal Defender Services of Wisconsin, Inc., by Craig W. Albee, Joseph A. Bugni, Shelley M. Fite, and Jessica Arden Ettinger, represented petitioner-appellant Tyler A. Montour, who is a natural person, in the District Court for the Eastern District of Wisconsin. Those proceedings were before the Honorable William C. Griesbach, District Judge, and the Honorable Nancy Joseph, Magistrate Judge. Federal Defender Services of Wisconsin, Inc., by Jessica Arden Ettinger, represents Montour before this Court.

This is a federal habeas matter that arises out of state court in Wisconsin. Melissa Anne Frost (then with Rizzo & Diersen, S.C., now with Hahn Law Office) represented Montour at trial in Walworth County Circuit Court before the Honorable David M. Reddy. Ann Rene Auberry (Rebholz & Auberry) represented Montour in his post-conviction proceedings before the Walworth County Circuit Court, over which the Honorable Kristine E. Drettwan presided, and in his appellate proceedings before the Wisconsin Court of Appeals and Wisconsin Supreme Court. The Honorable Mark D. Gundrum, Brian K. Hagedorn, and Lisa S. Neubauer presided over Montour's direct appeal. The Wisconsin Supreme Court declined review in an unsigned opinion.

Date: December 14, 2022

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger

*Counsel for Tyler A. Montour*

(i)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT...............................................................................(i)

TABLE OF AUTHORITIES................................................................ v

JURISDICTIONAL STATEMENT ................................................ 1

ISSUE PRESENTED ........................................................................... 2

STATEMENT OF THE CASE......................................................... 3

I.    Montour trusted Frost to effectively represent him...................................... 3

    A.    Montour faced serious charges after eyewitnesses saw him fire a gun from a moving vehicle and a bullet grazed one witness's leg................................................................ 3

    B.    Frost based her approach to the case on an assumption that none of the State's key witnesses would appear at trial to testify against Montour................................................... 4

    C.    On the first day of trial, the witnesses appeared and testified as expected........................................................ 8

    D.    Frost didn't use her off-hours during trial to develop a Plan B.. ...................................................... 11

    E.    The second day of trial proved even worse for Montour. .......................... 12

    F.    Frost refused to pivot and argue for the lesser-included offense.. .............. 15

Federal Defender Services
of Wisconsin, Inc.

## TABLE OF CONTENTS—Continued

Page

II.   Frost acknowledged her incompetent representation, yet the
      Wisconsin courts stamped her every move "strategic" and affirmed.. ................ 19

      A.   After trial, Frost saw the serious errors in her performance;
           Montour paid the price of a substantial sentence. ....................................... 19

      B.   Montour sought post-conviction relief in Wisconsin state
           court, alleging that Frost had provided ineffective assistance
           of counsel. .................................................................................................... 20

      C.   Contrary to Frost's candid self-assessment, the trial court
           determined that Frost performed admirably and blamed
           Montour for her errors. .................................................................................. 23

      D.   The Wisconsin Court of Appeals affirmed; the Wisconsin
           Supreme Court denied review. ....................................................................... 25

      E.   The district court denied federal habeas relief. ............................................ 26

SUMMARY OF THE ARGUMENT .......................................................................................... 28

ARGUMENT .............................................................................................................................. 30

I.    Frost performed deficiently. ...................................................................................... 30

      A.   The Wisconsin Court of Appeals's decision that Frost
           performed adequately wasn't simply wrong—it was
           unreasonably wrong. ..................................................................................... 30

           1.   The court's decision rests on unreasonable
                determinations of fact. ........................................................................ 30

           2.   The court unreasonably applied *Strickland* when
                denying relief. ...................................................................................... 34

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF CONTENTS—Continued**

**Page**

B.    The law and justice require finding that Frost's performance was objectively unreasonable................................................................ 40

1.    Frost's failure to adjust course was objectively unreasonable........................................................................ 41

2.    To endorse the Wisconsin court's ruling would be to bless incomplete attorney-client communication and fraud on the court.............................................. 43

II.    Frost's deficient performance prejudiced Montour. .............................. 45

CONCLUSION ................................................................................ 50

CERTIFICATE OF COMPLIANCE AND SERVICE

CIRCUIT RULE 30(d) STATEMENT

SHORT APPENDIX

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adeyanju v. Wiersma,*
    12 F.4th 669 (7th Cir. 2021) ............................................................ 6

*Atkins v. Zenk,*
    667 F.3d 939 (7th Cir. 2012) ...................................................... 38, 44

*Ben-Yisrayl v. Buss,*
    540 F.3d 542 (7th Cir. 2008) ...................................................... 27, 40

*Bridges v. United States,*
    991 F. 3d 793 (7th Cir. 2021) ........................................................ 43

*Brown v. Davenport,*
    142 S. Ct. 1510 (2022) ................................................................. 27

*Buck v. Davis,*
    137 S. Ct. 759 (2017) .................................................................. 49

*Dunn v. Jess,*
    981 F.3d 582 (7th Cir. 2020) ................................................... *passim*

*Dunn v. Neal,*
    44 F.4th 696 (7th Cir. 2022) ...................................................... 27, 48

*Dunn v. Reeves,*
    141 S. Ct. 2404 (2021) ................................................................. 38

*Falconer v. Lane,*
    905 F.2d 1129 (7th Cir. 1990) ....................................................... 47

*Herring v. New York,*
    422 U.S. 853 (1975) ............................................................... 45, 47

*Hinton v. Alabama,*
    571 U.S. 263 (2014) ................................................................... 41

*Jones v. Calloway,*
    842 F.3d 454 (7th Cir. 2016) ........................................... 34, 36, 39, 48

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## TABLE OF AUTHORITIES — Continued

Page(s)

*Jones v. Zatecky,*
917 F.3d 578 (7th Cir. 2019) ........................................ 49

*McAfee v. Thurmer,*
489 F.3d 353 (7th Cir. 2009) ........................................ 48

*State v. Denny,*
357 N.W.2d 12 (Wis. Ct. App. 1984) ........................... 5

*Stanley v. Bartley,*
465 F.3d 810 (7th Cir. 2006) ........................................ 43

*Strickland v. Washington,*
466 U.S. 668 (1984) ........................................... *passim*

*Sullivan v. Fairman,*
819 F.2d 1382 (7th Cir. 1987) ...................................... 44

*Thomas v. Clements,*
789 F.2d 760 (7th Cir. 2015) .................................. 35, 42

*United States ex rel. Barnard v. Lane,*
819 F.2d 798 (7th Cir. 1987) ....................................... 41

*Ward v. Sternes,*
334 F.3d 696 (7th Cir. 2003) ....................................... 30

*Wiggins v. Smith,*
539 U.S. 510 (2003) .................................................... 36

*Williams v. Taylor,*
529 U.S. 362 (2000) ............................................... 34, 37

*Woolley v. Rednour,*
702 F.3d 411 (7th Cir. 2012) .................................. 35, 41

*Yarborough v. Gentry,*
540 U.S. 1 (2003) ....................................................... 45

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## TABLE OF AUTHORITIES—Continued

Page(s)

**Federal Constitutional Provisions and Statutes**

U.S. Const. amend. VI ................................................ 28, 38, 43, 50

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 2243 ......................................................... 27, 40, 45

28 U.S.C. § 2253 ................................................................... 1

28 U.S.C. § 2254 ............................................................. *passim*


**Wisconsin Statutes**

Wis. Stat. § 939.32 (2015) ..................................................... 3

Wis. Stat. § 939.50 (2015) .................................................. 3, 4

Wis. Stat. § 940.01 (2015) ..................................................... 3

Wis. Stat. § 941.29 (2015) ..................................................... 4

Wis. Stat. § 941.30 (2015) ..................................................... 4

Wis. Stat. § 973.01 (2015) .................................................. 3, 4


**Other Authorities**

"Plan-Continuation Bias,"
   *APA Dictionary of Psychology*, Am. Psych. Ass'n,
   https://tinyurl.com/j7ytu6zj (last visited Dec. 13, 2022) ..................... 16

ABA Standards for Criminal Justice,
   *Standards for the Defense Function* (4th ed. 2015) ............................. *passim*

Federal Defender Services
of Wisconsin, Inc.

**JURISDICTIONAL STATEMENT**

This is a direct appeal from a final order and judgment denying a habeas petition. The district court had jurisdiction under 28 U.S.C. § 2254. This Court has jurisdiction on appeal under 28 U.S.C. §§ 1291 and 2253, in light of the district court's grant of a certificate of appealability. The district court entered an opinion and order denying the petition for habeas relief on July 21, 2022. Montour timely filed a notice of appeal on August 4, 2022.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**ISSUE PRESENTED**

The Sixth Amendment promises effective assistance of counsel. Under this Court's precedent, counsel performs deficiently when she makes an unreasonable assumption about key testimony; bases her approach to the case on that assumption; and then remains nearly passive when her assumption is proven wrong. That deficient performance prejudices her client when there is a reasonable probability of a different outcome but for her error.

Tyler Montour's counsel rushed to trial on an assumption that the State's witnesses wouldn't appear and testify to the events in the complaint; she adopted an all-or-nothing theory based on that assumption; and, even after all the witnesses testified, she refused to pivot and argue for the lesser-included offense. On weak evidence of mens rea, Montour was convicted of the greater offense and received a sentence almost three times longer than he could have received for the lesser-included offense.

Was Montour denied effective assistance of counsel?

Federal Defender Services
of Wisconsin, Inc.

## STATEMENT OF THE CASE

I.    **Montour trusted Frost to effectively represent him.**

A.    **Montour faced serious charges after eyewitnesses saw him fire a gun from a moving vehicle and a bullet grazed one witness's leg.**

In June 2015, Melissa Frost was appointed to represent Tyler Montour on charges of attempted first-degree intentional homicide and unlawful possession of a firearm.[1] According to the criminal complaint, Adrian Valadez ("Adrian"), Alex Valadez ("Alex"), and Pedro Gonzalez had reported an incident at the Hawk's Nest Bar a few days earlier.[2] At the bar, Montour and Blake Kruizenga exchanged words over an incident involving Montour's sister. Montour then left and got into a car that Gonzalez was driving. He directed Gonzalez to "drive near the" bar as they left.[3] Kruizenga and Adrian, who were standing just outside, saw headlights approaching; then, Montour rolled down the passenger window, yelled "what's up bitch ass niggas," and fired multiple shots in their direction.[4] Adrian told the police that he clearly saw Montour fire the gun and that Kruizenga had been hit in the leg.[5]

The charges were serious. Under Wisconsin law, a conviction for attempted first-degree intentional homicide carries a maximum sentence of 40 years' initial confinement.[6]

---

[1] Abbreviations are used throughout this brief. Fed. R. App. P. 28(e). Documents in the record are cited as "R.___:___," with the first number indicating the docket entry and the second number providing a pin citation. All pin citations to documents in the Amended Record (R.39) are to the Bates-stamped pagination. Documents in the Short Appendix are cited as "App.___."

[2] R.39:1–2. The complaint identifies Alex Valadez by his former last name, Garnica.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 2.

[6] Wis. Stat. §§ 939.32(1)(a), 939.50(3), 940.01(1)(a), 973.01(2)(b)(1) (2015).

3

First-degree recklessly endangering safety while armed is a lesser-included of that offense, and it carries a maximum penalty of 7½ years' initial confinement.[7] And unlawfully possessing a firearm carries a maximum sentence of 5 years' initial confinement.[8]

### B.    Frost based her approach to the case on an assumption that none of the State's key witnesses would appear at trial to testify against Montour.

Early in the case, Frost learned that the State might have trouble compelling at least one of its key witnesses to testify. Just after the preliminary hearing, she heard that Kruizenga " was not compliant with his probation agent" and "the state had not located" him.[9] The prosecutor told Frost that the State "intended to proceed with or without him."[10] But, as Frost later would recount, she heard only that the State "might not have the complete cooperation of the witnesses that it needed to prove its case."[11] She demanded a speedy trial knowing that, "at some point," Kruizenga might "be picked up for his probation violation."[12]

Frost then built her defense theory on an assumption that none of the eyewitnesses would appear to testify to the events in the complaint. From her perspective, Montour "did not do this thing" because the State couldn't produce a witness who would say otherwise.[13] She didn't seek out alternative perspectives as to what happened. Critically, although Frost and Montour met before trial, they never candidly discussed whether he had

---

[7] *Id.* §§ 941.30(1), 973.01(2)(b)(6m) (2015).
[8] *Id.* §§ 941.29(2)(a), 939.50(3)(g), 973.01(2)(b)(7) (2015).
[9] R.39:772.
[10] *Id.*
[11] *See id.* at 772–73; *see id.* at 795.
[12] *Id.* at 772.
[13] *Id.* at 772–73.

Federal Defender Services
of Wisconsin, Inc.

fired the gun and, if so, what he was thinking at the time.[14] She also didn't have any evidence that someone else was the shooter.[15]

At several points leading up to trial, Frost learned that all the State's key witnesses would testify. About two weeks before trial, the State confirmed that Adrian was cooperating and had "made it clear that he intended to testify and testify truthfully."[16] At the final hearing, five days before trial, the State explained that it would present between nine and eleven witnesses, several of whom (including Kruizenga, Alex, and Adrian) were on probation.[17] By then, the State also had given Frost its witnesses' files, and at least one report indicated that Gonzalez was serving as a confidential informant.[18] The fact that these critical witnesses either were on probation or serving as a confidential informant should have been a red flag. It meant that they had probation agents who would explain to them the consequences of failing to comply with a trial subpoena.[19] And common sense demanded that a person serving as a confidential informant was likely to appear in court to testify, as required. What's more, to avoid testifying, all the witnesses would have to dodge bench warrants for their arrest. Well before trial began, then, Frost had numerous reasons to believe her initial assumption was wrong and that she needed to recalibrate her all-or-nothing approach.

---

[14] App.12.
[15] *See* R.39:797–98 (referencing *State v. Denny*, 357 N.W.2d 12 (Wis. Ct. App. 1984)); App.6–7 (same)
[16] R.39:914.
[17] *Id.* at 142–43, 149.
[18] *See id.* at 144, 553.
[19] *See* R.48:1062.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Before trial, Frost had two other key pieces of information. First, she had evidence that undermined the mens rea required for attempted first-degree intentional homicide—that the shooter intended to kill or took action that he knew was "practically certain to cause" death.[20] The defense investigator had learned that the bullets struck the bar's back door just inches from the ground.[21] That close-to-the-ground damage was consistent with Kruizenga's injury—the bullet grazed Kruizenga just above his sock line—and indicated that the shooter had aimed at the ground.[22] As this Court has recognized, bullets fired several feet off the ground "evinc[e] intent to shoot chest high and thus to kill"; bullets fired toward the ground evince intent "just to frighten." *Adeyanju v. Wiersma*, 12 F.4th 669, 675 (7th Cir. 2021). And, second, Frost knew that the jury would be instructed on the lesser-included offense. In what she would later describe as an "off the cuff, hey by the way"-type conversation, Frost explained to Montour that the State wanted the instruction and that she saw no basis to object, so "it was going to happen."[23]

Still, Frost didn't develop a "Plan B." She knew that, if the State's witnesses appeared, two witnesses would testify that they saw Montour fire a gun in their direction. Yet, Frost formed no plan to dispute mens rea and argue for the lesser-included offense based on the shooter aiming towards the ground. Instead, she fixated on her all-or-nothing theory that it wasn't Montour. And she approached trial thinking only that Kruizenga, Adrian, Alex, and Gonzalez wouldn't testify otherwise.

---

[20] R.39:697.
[21] *Id.* at 812; R.48:1070 (Ex. 78).
[22] 39:252, 812–13; R.48:1069 (Ex. 15)
[23] R.39:784.

Federal Defender Services
of Wisconsin, Inc.

Indeed, Frost was so confident that the State's witnesses wouldn't testify that she encouraged Montour to reject a reasonable plea offer. The State offered that, if Montour pleaded guilty to the lesser-included offense of recklessly endangering safety, then it would recommend 10 years' initial confinement.[24] But Frost advised Montour to reject the deal. She felt that he "had a lot of strength at trial" and that there was "about a 50/50 shot on a case like this."[25] That risk analysis, of course, still rested on her assumption that the eyewitnesses wouldn't appear to testify against him. Further, she believed that it would be better to go to trial and lose than plead guilty.[26] According to Frost, it would benefit Montour for the court to hear "directly from these witnesses" in light of their "nature and character"; if they appeared at trial, then they would give the court "better information" through their testimony "than what [Frost] could give at sentencing [by] just reciting things into the record," and "there was no way [she] was going to be able to pull these people in for a sentencing hearing."[27] Montour "assumed . . . [Frost] knew what [she] was doing"; so, he declined to plead guilty and proceeded to trial.[28]

---

[24] *Id.* at 773.
[25] *Id.* at 775, 799.
[26] *Id.* at 775–76.
[27] *Id.* at 776.
[28] *See id.* at 784, 796.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### C.     On the first day of trial, the witnesses appeared and testified as expected.

Rather than focusing on the elements of the State's case, Frost began trial fixated on recorded jail calls that she had requested and still not received. Two weeks before trial, Frost had become suspicious that Kruizenga or Adrian struck a side deal with the State.[29] She'd requested each man's jail calls to investigate further, but on the morning of jury selection, she still didn't have those recordings.[30] With the court's help, Frost received a copy around noon that day.[31] She "never considered" seeking an adjournment because she didn't know "[i]f there was going to be anything helpful" on them.[32] Most importantly, though, she was "ready to go" because she "still believed that the state's witnesses perhaps were not going to show up."[33]

Frost's lingering confidence that the State's witnesses wouldn't appear should have dissipated quickly. At the outset of voir dire, the prosecutor named thirteen potential witnesses—including Kruizenga, who (he noted) was "sitting here in the front row."[34] Then, in its opening statement, the State laid out the case just as it appeared in the complaint.[35] And it promised the jurors that they would hear that story from not only Kruizenga and Adrian, but also Gonzalez.[36]

---

[29] *Id.* at 778–79, 802–03.
[30] *Id.* at 778–79.
[31] *Id.* at 780.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 164.
[35] *Id.* at 234–35.
[36] *Id.* at 234–35, 239.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The defense met the State's opening with silence. Still believing that some or all the State's witnesses wouldn't appear, Frost decided to reserve her opening statement until she presented the defense's case-in-chief.[37]

The State's witnesses proceeded to testify just as the prosecutor had outlined. Kruizenga, Adrian, and Alex each appeared and told the same story. They all were at the Hawk's Nest that night, where they saw Montour.[38] Kruizenga and Montour got into an argument because Kruizenga and Adrian previously robbed Montour's sister and her boyfriend, Gonzalez.[39] Later, while Kruizenga and Adrian stood outside the bar, smoking, they saw Montour walk out of the bar and pass between them.[40] A few minutes later, a car drove towards them.[41] Kruizenga and Adrian clearly saw Montour in the passenger seat, holding a black handgun, and heard him yell "bitch ass nigger" before firing several shots in their direction.[42] Alex heard gunshots from where he was inside the bar, and he didn't see Montour there.[43] Kruizenga and Adrian fled and met up at Kruizenga's car; while driving, Kruizenga noticed he had been shot in the leg.[44] But the wound was superficial; he fished the bullet out and didn't seek medical attention.[45]

---

[37] *Id.* at 240, 782.

[38] *Id.* at 241–42, 297–99, 359–60.

[39] *Id.* at 242–45, 317–20, 362–63.

[40] *Id.* at 246–47, 301.

[41] *Id.* at 247, 301.

[42] *Id.* at 247–50, 270, 301–03.

[43] *Id.* at 364–66.

[44] *Id.* at 250–52, 304–07.

[45] *Id.* at 266–68, 282; R.48:1069 (Trial Ex. 15).

9

Although the witnesses' stories aligned generally, there was one key difference between Kruizenga and Adrian's testimony. Each had stated that he was standing next to the other in the alley at the time the shooting happened. And Kruizenga testified that, at the time he saw the gun, it was "pointed directly at [him]."[46] But Adrian testified: "I don't think it was pointed directly at me"; rather, "it was pointed at the direction where I was standing."[47] The difference was material—it bore directly on whether the shooter aimed to kill or acted in a way that he knew was "practically certain to cause" death.

Frost's cross-examinations ignored that material inconsistency and drew out only immaterial discrepancies in their testimony. With respect to Kruizenga, her questions centered on the fact that he had been slow to cooperate with authorities and slightly inconsistent in his account of what happened; namely, he couldn't pinpoint the color of the car or how many shots were fired.[48] Similarly, her questions to Adrian highlighted only that he originally thought the car was a different color and that there could have been a third passenger.[49] And, with respect to Alex, Frost's questions focused on where people were sitting or standing inside the bar *before* the shooting and provided him an opportunity to reject any suggestion that he had coordinated his story with other witnesses.[50] Even worse, her questions provided an opportunity for Kruizenga and Adrian to repeat the testimony that mattered to the State's case. Each man testified again that he clearly

---

[46] R.39:250.
[47] *Id.* at 303–04.
[48] R.39:271–92.
[49] *Id.* at 327–49.
[50] *See id.* at 371–92.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

saw Montour with the gun, shooting toward him.[51] Further, Frost drew out the details of Kruizenga and Adrian's attack on Montour's sister, years earlier, which fed into the State's theory of Montour's motive for this shooting.[52]

By the time the court recessed for the day, the State had upended Frost's no-show assumption and approach. Multiple witnesses had presented a cohesive story that Montour shot at Kruizenga and Adrian, likely as retribution for their earlier attack on his family. In turn, they had upended any argument that the State hadn't presented a witness who could identify Montour as the shooter. And their testimony exposed the unreasonableness of Frost's assumption—they understood, from their probation agents, that they'd be in trouble if they didn't appear.[53]

### D.    Frost didn't use her off-hours during trial to develop a Plan B.

Frost poorly used the time she had between trial days. Given the events of the first day, Frost could have used the evening to reassess her defense theory, adjust course, and prepare for a stronger second day. She could have rewritten her opening statement. She might have considered a new line of cross-examination. Instead, after a full day of trial at which her no-show assumption was upended and with multiple witnesses set to testify for the State the next day, Frost elected to stay up all night listening to the jail calls.[54]

There were many recorded calls and, ultimately, listening to them proved fruitless. Of the more than 170 calls the defense reviewed that night, in just one did Frost believe

---

[51] *See id.* at 278–79, 351–52.
[52] *Id.* at 288–91, 341–42, 348.
[53] *Id.* at 295, 369.
[54] *See id.* at 403, 781.

there was evidence of a side deal and an undisclosed police report.[55] But when Frost raised these concerns with the court the next morning, the prosecutor explained that there was no side deal and represented that he was unaware of any unproduced police reports.[56] That cleared the matter up for the court: "if there's nothing out there, there's nothing out there."[57] In other words, Frost's late-night review had amounted to nothing.

### E.     The second day of trial proved even worse for Montour.

Spending the evening listening to the jail calls harmed the defense. As Frost later recounted, it had a "devastating" effect on her performance the following day.[58] She was exhausted. She was "drawing objections . . . that [she] would not normally draw," "couldn't reform [her] questions and get back on track," and "got yelled at in front of the jury by the Judge."[59] The situation was so bad that "[i]t was like [she] had never tried a case before and this was [her] first day on the job."[60]

Meanwhile, the State spent the second day of trial buttressing the eyewitnesses' credibility. It offered the testimony of others in the bar who could corroborate Kruizenga, Adrian, and Alex's testimony.[61] A detective testified to having found bullets at the scene and bullet damage to the bar's backdoor.[62] A firearms analyst testified that the bullet fragment in evidence could have been fired from "a black handgun"—i.e., like the one

---

[55] *Id.* at 404–06.
[56] *Id.* at 406–08.
[57] *Id.* at 409.
[58] *Id.* at 781.
[59] *Id.* at 782.
[60] *Id.* at 810.
[61] *Id.* at 499–504 (bar patron), 517–25 (bartender).
[62] *Id.* at 417–28.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the eyewitnesses testified seeing Montour holding.[63] And a pathologist testified that "a gun is a killing tool" and gunshot wounds to extremities (such as legs) "could be potentially lethal."[64]

Frost's cross-examinations did little to undermine these witnesses' testimony, but she elicited a few statements that would be helpful in arguing that Montour committed only the lesser-included offense. Frost asked the detective where someone would aim if he "were going to use deadly force," and the detective answered clearly: "center mass," in the "middle of the chest."[65] And, with respect to the firearms analyst, Frost successfully elicited testimony that bullets "go in a straight line from whatever direction the barrel is pointed."[66]

Gonzalez's testimony presented the low-point of the day for the defense. Gonzalez testified that he picked Montour up from the Hawk's Nest that night and, as they were driving away, Montour, seated in the passenger seat, yelled something at Kruizenga and Adrian.[67] Then, Gonzalez testified, he heard gunshots coming "[f]rom [his] right side," "right next to [him]."[68] He also testified that he and Montour were living together at the time, and he had seen Montour with a handgun before.[69] He wept on the stand while

---

[63] *Id.* at 481.
[64] *Id.* at 490.
[65] *Id.* at 436–37.
[66] *See id.* at 483–84.
[67] *Id.* at 582, 584–85.
[68] *Id.* at 585-86.
[69] *Id.* at 582, 593–94.

explaining that he considered Montour to be his family, it was difficult to testify against him, and he (Gonzalez) feared for his safety because he was cooperating.[70]

On cross-examination, Frost caused Gonzalez to repeat the points helpful to the State's case. In response to her questions, he testified that he drove, with Montour, in front of Kruizenga and Adrian, who were standing outside the bar.[71] He also repeated that Kruizenga and Adrian had violently robbed him and his girlfriend, Montour's sister.[72] And he explained that he was intimidated when he told the police about the incident at the Hawk's Nest, which accounted for any discrepancies in his story.[73] With that, the State rested.[74]

At this point, the defense was at a crossroads. Contrary to Frost's assumption, each key fact witness had appeared. Two of them had testified that Montour was the shooter; others had provided corroborating evidence. And Frost was incapable of meaningfully impeaching their testimony. So, she had a choice to make: continue with the all-or-nothing approach or pivot to an argument that the State had proven, at most, the lesser-included offense. The defense had reserved its opening statement, so Frost had flexibility. She could easily switch from her doomed plan—that Montour wasn't the shooter, and no one would testify otherwise—to arguing, in the alternative, for the lesser-included offense, because the State hadn't proven that the shooter acted with the requisite intent.

---

[70] *See id.* at 592–93, 614, 719.
[71] *Id.* at 603–08.
[72] *See id.* at 616.
[73] *See id.* at 609; *see also id.* at 588–89.
[74] *See id.* at 625.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**F.    Frost refused to pivot and argue for the lesser-included offense.**

That evening, before the defense case began, Frost visited Montour at the jail.[75] She was fatigued, but he saw the situation clearly: he couldn't win the case outright, and they needed to change course.[76] Montour believed that he needed to take the stand to explain that he had never intended to kill Kruizenga or Adrian; he merely meant to scare them, and, to do that, he'd shot at the ground, "in their general direction."[77]

By then, Frost knew more than enough to realize that her original approach wouldn't carry them to an acquittal. At a minimum, she knew:

- The jury had not heard the defense's theory of the case, because she had reserved her opening statement;

- All the State's eyewitnesses had testified, contrary to her assumption;

- The detective had testified that someone with intent to kill aims at "center mass," Adrian had testified that the gun was not pointed directly at him, and Kruizenga had been struck in the lower leg;

- The defense investigator would testify that the bullet damage was near the ground, corroborating that the shooter aimed toward the ground;

- The defense had no witness who would testify that the shooter was someone other than Montour;

- Montour had just told her that he was the shooter; and

- The jury would be instructed on the lesser-included offense.

---

[75] *Id.* at 789.

[76] *Id.* at 817.

[77] *Id.* at 789–90, 827–28.

Yet, Frost refused to pivot. She "strongly encouraged [Montour] not to [testify] . . . because [she] believed if he testified the trial was going to be over."[78] And they never discussed changing strategies to pursue the lesser-included offense.[79] Of course, Montour didn't need to testify for her to make that argument. But she resolved to continue with the "it wasn't Tyler Montour"-defense.[80] Recounting the decision later, Frost observed: "I didn't consider anything beyond the path that we were on because there was no more room in my brain to think about anything else."[81]

Frost's paralysis aligns with a phenomenon called "plan-continuation bias." It occurs when a person anticipates how events will unfold, develops a plan based on her initial assumption, and then fails to recalibrate when events unfold differently.[82] Here, Frost assumed that the State's key witnesses wouldn't appear, and she planned to push for an all-out acquittal on the premise that no one would testify that Montour had fired the gun. She ignored the warning signs that the witnesses would appear. And, even after they testified, she continued to argue that he wasn't the shooter. Frost never reevaluated her assumption or her approach, even as the evidence undermined both.

The next morning, the defense's case-in-chief made little headway against the State's presentation. In her opening statement, Frost failed to articulate *any* theory.[83]

---

[78] *Id.* at 789.

[79] *Id.* at 783.

[80] *Id.* at 789.

[81] *Id.* at 810.

[82] *See* "Plan-Continuation Bias," *APA Dictionary of Psychology*, AM. PSYCH. ASS'N, https://tinyurl.com/j7ytu6zj (last visited Dec. 13, 2022).

[83] R.39:632–33.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Then, she called three witnesses whose testimony did nothing to rebut the State's evidence that Montour had fired the gun. At best, Frost's questioning of her investigator brought in evidence that the bullet damage to the bar's back door was low to the ground.[84] Otherwise, in recalling Adrian and Kruizenga, her questions effected inconsequential impeachment—that Adrian initially reported seeing a third person in the car and that Kruizenga initially fabricated a story to avoid being placed at the bar that night, in violation of his probation.[85] And, in response to either Frost's own questions or those the State asked on cross, each man (again) repeated the points that bolstered the State's case. Adrian told police that he saw Montour hanging out the car window at the same time that he saw a muzzle flash and, therefore, concluded "that Tyler was the one who was shooting at [him]."[86] And Kruizenga testified that he consistently had reported to the police, his probation agent, and the jury that "Tyler Montour shot at [him] with a gun."[87] That statement was the last piece of testimony the jury heard. The defense rested.[88]

Closing arguments mirrored trial. The State pounded the unimpeached facts—all the witnesses agreed that Montour was at the bar, that there was an altercation between him and Kruizenga, and that he left the bar only to reappear outside shortly thereafter, shooting at Kruizenga and Adrian from a car.[89] Further, the State emphasized, Gonzalez was there in support of someone who had victimized him years earlier, and testifying

---

[84] *Id.* at 642–44, 812–13; *see also* R.48:1070–71 (Exs. 78 & 86).
[85] R.39:654–57.
[86] *Id.* at 667, 671.
[87] *Id.* at 689.
[88] *Id.* at 689–91.
[89] *Id.* at 715–18.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

against someone he considered family, at risk to his own safety.[90] And it stressed the pathologist's opinion that "[a] gunshot to even the most remote appendage could be lethal."[91] All these points supported the State's theme: "[Y]ou do not fire a handgun at another human being from ten feet away with any other intention than to kill them."[92] The State made no argument in favor of the lesser-included offense. Instead, it told the jury that it was "not going to need that instruction."[93]

Just as the State hammered its themes, Frost went back to hers: Montour wasn't the shooter. In closing argument, this took the form of an unsubstantiated conspiracy theory. According to Frost, "[e]veryone was talking about" what happened at the Hawk's Nest and, for some reason, "everyone" had settled on Montour as the culprit.[94] To suggest that the charges were manufactured, Frost pointed to mild inconsistencies in the testimony—e.g., that Kruizenga and Adrian had testified that they were outside the bar, while the bartender had testified that "they were just exiting the bar into the back hallway when the shots came through."[95] Ultimately, she urged the jury to conclude that others had pinned the shooting on Montour because the witnesses were biased and he "was an easy target."[96] She then wrapped Montour in the flag of reasonable doubt and sat down, never once having mentioned the lesser-included offense.[97]

---

[90] *Id.* at 718–19.
[91] *Id.* at 721.
[92] *Id.*
[93] *Id.* at 721.
[94] *See id.* at 723.
[95] *Id.* at 725.
[96] *Id.*at 728–31.
[97] *Id.* at 734–36.

18

On rebuttal close, the State countered that unsubstantiated argument. It explained that no one stood to gain from pinning this crime on Montour, and "panicked people" cannot reasonably "recollect precisely where they went and what they did."[98] Further, the prosecutor emphasized, the testimony had been that both Kruizenga and Adrian "saw a gun. Both saw it in the hands of [Montour]. Both saw that gun fire. Both heard that gun fire. Saw it fired at them. [And o]ne of them has the marks to prove it."[99]

Convinced, the jury convicted. It found Montour guilty of attempted first-degree intentional homicide and unlawfully possessing a firearm.[100]

## II. Frost acknowledged her incompetent representation, yet the Wisconsin courts stamped her every move "strategic" and affirmed.

### A. After trial, Frost saw the serious errors in her performance; Montour paid the price of a substantial sentence.

In the pause between verdict and sentencing, Frost realized how badly she had represented Montour. At his sentencing, she reflected that this "was one of the most bizarre trials that [she] probably will ever be a part of."[101] And, in particular, she recognized that it was entirely "[her] fault" for not pursuing the lesser-included offense during closing.[102] As she explained to the court, three jurors had told her after the trial:

> [H]onestly, we didn't quite understand the difference between the two different offenses, so we took a while and tried to piece it together. But in the end, we just picked one because we weren't really sure that there was any big difference in it. . . . [W]e knew he was the one who pulled that trigger. It was

---

[98] *Id.* at 736.
[99] *Id.*
[100] *Id.* at 747.
[101] R.48:1093.
[102] *Id.* at 1102.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

just a matter of, um, trying to figure out what was the right conviction.[103]

In other words, the jurors had struggled with the legal concept of mens rea—the type of issue best articulated and explained in opening and closing arguments. But it wasn't until receiving that juror feedback, after trial, that Frost finally realized she "should have gone over that [lesser-included offense] better."[104]

It was Montour, of course, who bore the consequences of Frost's actions. The court sentenced him to a total of 25 years' initial confinement, followed by 15 years' extended supervision.[105] His prison term on the attempted first-degree intentional homicide charge—20 years—was twice as much time as what the State had offered in its pre-trial plea deal. And it was nearly three times the statutory maximum he would have faced if convicted of the lesser-included offense.[106]

### B.    Montour sought post-conviction relief in Wisconsin state court, alleging that Frost had provided ineffective assistance of counsel.

After sentencing, Montour was appointed new counsel to help him seek post-conviction relief. As relevant here, the defense argued that Frost provided constitutionally ineffective assistance by failing to pursue the lesser-included offense.[107]

Montour's claim invoked the familiar test of "deficient performance" and "prejudice." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether Frost performed defi-

---

[103] *Id.*

[104] *Id.*

[105] App.1; R.48:1125–26.

[106] *See supra* at 3–4 & nn.6–7.

[107] R.39:1006.

Federal Defender Services
of Wisconsin, Inc.

ciently hinged on whether her performance "was within the range of competence de-
manded of attorneys in criminal cases," evaluated against "prevailing professional
norms." *Id.* at 687–88. Her performance prejudiced Montour if there is "a reasonable prob-
ability that, but for [her] unprofessional errors, the result of the proceeding would have
been different." *Id.* at 694. "A reasonable probability is a probability sufficient to under-
mine confidence in the outcome." *Id.*

It was the Wisconsin court's job, then, to determine whether Frost's performance
was objectively reasonable. In *Strickland*, the Supreme Court explained that "reasonable-
ness" must be assessed against "prevailing professional norms," such as those "in Amer-
ican Bar Association standards and the like." *Id.* at 688. As such, the court needed to con-
sult professional standards and evaluate Frost's performance against them.

At the time, the ABA Standards for Criminal Justice obligated Frost:

- "to investigate" the case by "interview[ing] the client as many times as nec-
  essary for effective representation," including "determin[ing] in depth the
  client's view of the facts and other relevant facts known to the client"[108];

- to " encourage candid disclosure by the client . . . and not seek to maintain
  a calculated ignorance" "[w]hen asking the client for information and dis-
  cussing possible options and strategies with the client"[109]; and

- to "work diligently to develop, in consultation with the client, an investiga-
  tive and legal defense strategy, including a theory of the case" and, "[a]s
  the matter progresses, . . . [to] refine or alter the theory of the case as neces-
  sary, and similarly adjust the investigative or defense strategy."[110]

---

[108] ABA Standards for Criminal Justice, *Standards for the Defense Function* 4-3.3(b) & (c)(i), 4-4.1(a)
(4th ed. 2015).
[109] *Id.* 4-3.3(d).
[110] *Id.* 4-3.7(c).

21

In short, prevailing professional norms imposed several obligations on Frost. She had to investigate the case, which included interviewing Montour in such detail that she couldn't "maintain a calculated ignorance" as to the facts. She had to develop an informed defense strategy. And she had to "adjust the . . . strategy" if new information became available to her "as the matter progresses"—i.e., she had to pivot, as needed.

At an evidentiary hearing, Frost testified about her approach to the case and her performance. She confirmed that her trial "strategy" was predicated on the State being unable to bring its witnesses to court; in the absence of someone testifying otherwise, she planned to argue that Montour wasn't the shooter.[111] She also testified that she never formulated a back-up plan, should the State's witnesses appear:

> Q: Okay. Once it became apparent that the state's witnesses would appear and they did testify, did that have any impact on your trial strategy at that point?
>
> A: No, it did not.
>
> Q: And at that point were you still planning to argue that Mr. Montour was not the person responsible for the shooting on April [sic] 12th outside the Hog's Nest [sic]?
>
> A: Planning to and did argue that.
>
> . . . .
>
> Q: Okay. As we were talking previously, once the state's witnesses did appear and did testify, did you consider changing your strategy and arguing for the lesser included offense?
>
> A: It never even crossed my mind.[112]

---

[111] R.39:772–73.
[112] *Id.* at 783–85.

The exchange articulated Frost's blind adherence to the all-or-nothing approach she adopted based on her unreasonable assumption that none of the State's key witnesses would appear. And Frost characterized it that way, too. She added that she "was pretty tunnel visioned on a not guilty across the board" and agreed she was "still in the all or nothing mode" during her closing argument.[113] In fact, she went on to say: "it never occurred to me to do anything but what I was doing through the entire trial. It never entered my scope that I might need to deal with this lesser included because we might lose."[114]

At the hearing, Montour also took the stand and offered testimony that complemented what Frost had explained. He confirmed that he and Frost never discussed reevaluating their strategy mid-trial, even though he had serious doubts that it was still viable after the witnesses showed up.[115]

### C.     Contrary to Frost's candid self-assessment, the trial court determined that Frost performed admirably and blamed Montour for her errors.

The trial court denied Montour's post-conviction motion in an oral ruling.[116] Applying *Strickland*, the court determined that Frost's performance wasn't deficient; and even if it were, Montour couldn't demonstrate prejudice from it.

With respect to Frost's performance, the court stamped her all-or-nothing approach both strategic and laudable.[117] It endorsed Frost's decision to seek a speedy trial "because the State's witnesses were possibly unavailable, uncooperative, absent, and of

---

[113] *Id.* at 785.

[114] *Id.* at 792.

[115] *Id.* at 817.

[116] App.21.

[117] *Id.* at 16–19.

unsavory character."[118] For related reasons, it agreed with Frost's advice that Montour decline the plea offer. It highlighted that "the eyewitnesses [were] maybe unavailable, uncooperative"; plus, the prosecutor had "poor trial skills" that might "alienate the jury" and, regardless, "the nature of the character of the alleged victims" provided the defense with "something to argue to the judge even if he was convicted."[119]

Nor did the court see any reason why Frost needed to adjust course mid-trial. Critically, the court viewed any issue with Frost's approach as being one of Montour's creation. It admonished Montour for waiting to "tell Ms. Frost that he was the shooter until the close of the State's case" and determined that he couldn't "blame her now for his actions and for what he chose to tell her and when."[120] According to the court, he had "play[ed] a game of bluff with the jury and even with his own attorney."[121] And, given that Montour already had rejected the plea offer, it was appropriate for Frost to "try[] to get the best out of this case that she possibly c[ould]" by continuing forward with the "all or nothing" approach, even after the witnesses had testified.[122] To make an argument in the alternative, the court reasoned, would have "made the[ defense] incredible to the jury."[123] The court didn't discuss any prevailing professional norm with which it believed Frost's performance aligned. Nor did it acknowledge that the defense had reserved its opening argument.

---

[118] *Id.* at 6.
[119] *Id.* at 8–9.
[120] *Id.* at 12–13.
[121] *Id.*
[122] *Id.* at 18.
[123] *Id.* at 19.

Given that ruling, the trial court touched only briefly on the issue of prejudice. It explained that there was no reasonable probability of a different result because the trial evidence supported the conviction.[124] In particular, the court cited the testimony that Montour "was the shooter, that he shot at the victims, [and] that he hit one of them."[125] Although all these points are consistent with the lesser-included offense's elements, the court believed them sufficient to prove attempted first-degree intentional homicide.

### D. The Wisconsin Court of Appeals affirmed; the Wisconsin Supreme Court denied review.

In a short opinion, the Wisconsin Court of Appeals agreed with the trial court's result but rested its affirmance entirely on *Strickland*'s performance prong. Most of its discussion recast, rather than repeated, what the trial court had said. According to the court of appeals, the trial court had found that Frost and Montour demanded a speedy trial "because they believed that the State's witnesses had credibility issues."[126] Further, "[Frost] and Montour discussed the possibility of a lesser included offense, and Montour agreed to forego a defense focusing on a lesser included offense."[127] Indeed, "electing not to argue for the lesser included offense was part of the strategy to which Montour and counsel committed before Montour leveled with counsel about his involvement."[128]

The court then offered a single-paragraph analysis of its own, concluding that Frost hadn't performed deficiently. Citing *Strickland*, the court held:

---

[124] *Id*. at 20.
[125] *Id*.
[126] *Id*. at 25.
[127] *Id*. at 26.
[128] *Id*. at 28.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

> [C]ounsel did not perform deficiently. Trial counsel devel-
> oped and pursued a strategy that Montour was not the
> shooter. Montour chose to pursue that strategy while with-
> holding crucial information that undermined that strategy.
> Montour argues that the way the evidence came in necessi-
> tated a strategy change. As is clear from the record, the strat-
> egy issues arose because Montour belatedly informed his
> counsel that he was the shooter. A defendant cannot create his
> own error by deliberate choice of strategy and then ask to re-
> ceive benefit from that error on appeal.[129]

Two points were missing from that analysis. The court of appeals, like the trial court, didn't cite to any contemporaneous professional standards, let alone discuss how Frost's approach aligned with them. And at no point did it acknowledge that Frost's purported "strategy" was premised on an assumption that the State's witnesses wouldn't appear.

Montour's counsel submitted a partial petition for review, premised on whether Frost provided ineffective assistance.[130] In a standard order, the Wisconsin Supreme Court declined review.[131] Montour didn't seek certiorari in the U.S. Supreme Court.

### E.     The district court denied federal habeas relief.

Montour filed a federal habeas petition that alleged the same issue—Frost "was ineffective in failing to pursue the lesser-included offense of recklessly endangering safety."[132] The State unsuccessfully moved to dismiss. As the district court explained, the partial petition fairly presented Montour's claim, in the language of *Strickland*, and there was no evidence the Wisconsin Supreme Court denied review on procedural grounds.[133]

---

[129] *Id.* at 29 (cleaned up and citation omitted).
[130] R.39:105.
[131] App.30.
[132] R.1:6.
[133] R.30:9.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The district court had to review Montour's *Strickland* claim through an AEDPA-tinted prism. First, it had to determine whether Montour had overcome AEDPA's demands by demonstrating that the Wisconsin Court of Appeals's decision either "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" or "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). Second, it had to determine whether Montour had demonstrated that "law and justice require" relief. *Id.* § 2243; *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). The inquiry was streamlined slightly because the Wisconsin Court of Appeals resolved Montour's claim based on Frost's performance alone. This meant that Montour had to make both showings (under AEDPA and § 2243) to demonstrate deficient performance. But, because that court remained silent as to prejudice, he needed to convince the court only that "law and justice require" relief on that prong. *See Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020).

The district court denied relief. It held that it owed deference to the Wisconsin appellate court's ruling that Frost had not performed deficiently.[134] Alternatively, it held that Montour couldn't demonstrate prejudice because, even if Frost had argued for the lesser-included offense, there were "counterarguments that the State could have advanced" and the jury heard all the evidence, anyways.[135] But it issued a certificate of appealability. Montour then appealed, sending the case to this Court for de novo review under the same framework. *See Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008).

---

[134] App.41–45.
[135] *Id.* at 45–47.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## SUMMARY OF THE ARGUMENT

Every defendant has a constitutional right to "effective" representation at trial. U.S. CONST. amend. VI; *Strickland*, 466 U.S. at 686. And the fact "[t]hat a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command." *Strickland*, 466 U.S. at 685. Put differently, constitutionally effective lawyers are not potted plants. Lawyers have an obligation to investigate the case and pick an informed theory that benefits their clients. Critically, they also must be ready to adjust course when new facts come to light that affect their original approach.

The Wisconsin Court of Appeals was unreasonably wrong in holding that Frost's performance passed constitutional muster. It based its decision on unreasonable factual findings. Frost didn't make a reasoned assessment that the witnesses weren't *credible*; she made an unreasonable assumption that the witnesses weren't *available*. And at no point during trial, after all the key witnesses testified, did she and Montour discuss the option of pursuing the lesser-included offense and strategically decide to forgo it. The Wisconsin court also unreasonably applied *Strickland* in concluding that Frost's ill-informed and inflexible approach satisfied the Constitution. It mislabeled her choices "strategic," it failed to assess her performance against prevailing professional norms, and it blamed Montour for her professional shortcomings.

Considered on the merits de novo, its plain that the law and justice require this Court to hold that Frost performed deficiently. Frost failed to prepare for the expected — that witnesses usually comply with subpoenas, particularly when their probation agents tell them to do so or when they are serving as a confidential informant. And she failed to

28

adjust when the expected happened—she blindly proceeded with an all-or-nothing approach, even after multiple witnesses testified that Montour was the shooter, instead of recalibrating and arguing in favor of the lesser-included offense. This performance fell short of the Sixth Amendment's promise. To hold otherwise would risk broadcasting that attorneys are free to forgo investigative communication with their clients and may knowingly press factual misstatements in court.

What's more, there's little doubt that Montour was prejudiced by Frost's performance. Given the evidence, conviction on the greater offense was far from certain. *Argument matters*. And the jury never heard why the evidence supported only the lesser-included offense. There is a reasonable probability that at least one juror would have held out for that offense with the benefit of a defense argument that explained the different mens rea requirements and lined up the evidence against the elements. After all, multiple jurors later admitted they were confused by the different offenses and "just picked one." This Court can have no confidence in a verdict reached by a guess. And Montour has been left to serve a sentence nearly three times as long as what he could have received if, instead, he had been convicted of the lesser-included offense.

Montour is being held in State custody in violation of federal law. He was denied his Sixth Amendment right to counsel. He respectfully asks this Court to reverse the judgment under review and order the district court to grant his petition for a writ of habeas corpus under 28 U.S.C. § 2254.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# ARGUMENT

## I.    Frost performed deficiently.

### A.    The Wisconsin Court of Appeals's decision that Frost performed adequately wasn't simply wrong—it was unreasonably wrong.

The Wisconsin appellate court's ruling suffers from both types of defects that concerned Congress. As explained at greater length below, it made two unreasonable determinations of fact *and* it misapplied controlling Supreme Court precedent in three distinct ways. *See* 28 U.S.C. § 2254(d)(1), (2). Any of those five unreasonable errors is enough to set aside the strictures of AEDPA and resolve Montour's claim de novo, "as law and justice require." *Id.* § 2243; *see, e.g., Dunn v. Neal*, 44 F.4th 696, 706 (7th Cir. 2022) (when a state court's "decision is not entitled to deference under the AEDPA, . . . we consider the *Strickland* challenge *de novo*").

#### 1.    The court's decision rests on unreasonable determinations of fact.

To begin, the Wisconsin appellate court's ruling is infected with two unreasonable determinations of fact. Under § 2254(d)(2), a state court makes an "unreasonable" factual determination when its finding is "against the clear weight of the evidence." *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003). Here, the court found that Frost's all-or-nothing "strategy" was based on her judgment that the witnesses had "credibility issues."[136] It also "found that [Frost] and Montour discussed the possibility of a lesser included offense, and Montour agreed to forego a defense focusing on a lesser included offense" as

---

[136] App.25.

"part of the trial strategy"; that "deliberate choice of strategy," it then reasoned, precluded him from claiming Frost's performance was deficient.[137] But the clear weight of the evidence is that Frost based her approach to the case on an unreasonable assumption that the witnesses weren't *available*, not a reasoned assessment that they weren't credible. And the record makes plain that, while Frost had a brief conversation with Montour *before trial* about the lesser-included offense, they never discussed pursuing the lesser-included offense during trial—when it became apparent that a shift in approach was needed. Thus, Montour never categorically rejected pursuit of the lesser-included offense.

a.     First, the court's decision rested on an unreasonable factual finding that Frost developed a defense theory based on a professional assessment of the evidence—specifically, that the witnesses weren't credible. A closer look at Frost's testimony makes plain, however, that Frost pegged her all-or-nothing theory to an assumption that the State's witnesses wouldn't appear to rebut it. She testified that her "strategy" rested on the "belief that the state might have difficulties in securing the cooperation of witnesses"; she started "preparing for trial immediately" to try to outrun Kruizenga being "picked up for his probation violation."[138] She also assumed that Adrian, Alex, and Gonzalez wouldn't appear. She believed that it was unlikely that "the state could find them and [that] they actually [would] show[] up at trial."[139]

---

[137] *Id.* at 26, 28–29.
[138] *Id.* at 772.
[139] *Id.* at 776.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

It was only Frost's thoughts on sentencing that implicated a minor credibility assessment. Frost explained that, if Montour were convicted, then she believed it would be better for him to have gone to trial rather than pleaded guilty in light of the witnesses' "nature and character."[140] She hypothesized that any testimony they *did* provide at trial might help mitigate Montour's sentence.[141] Even then, Frost believed, availability was the governing concern—there was "no way" they'd appear for a sentencing hearing.[142] And, importantly, this secondary thought concerned a choice between pleading guilty and going to trial, not what defense theory to advance *at trial.*

Collectively, this testimony makes clear that Frost formed a theory and demanded a speedy trial to pursue it based on an assumption about witness availability. At no point did she indicate that she had interviewed the State's witnesses or otherwise meaningfully evaluated their anticipated testimony and deemed it not credible. Thus, the record contradicts the court of appeals's finding. Frost didn't pursue a speedy trial or select her all-or-nothing trial theory based on witness "credibility issues." It follows that, in holding that Frost's performance was adequate because she formed a strategy based on witness "credibility issues," the court's decision rests on an unreasonable factual finding.

b.    Second, and separately, the court of appeals's decision rests on an unreasonable factual finding that Montour categorically rejected a defense based on the lesser-included offense. Before concluding that Frost didn't perform deficiently because she

---

[140] *Id.*

[141] *Id.*

[142] *Id.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"developed and pursued a strategy," the court found that Montour and Frost "discussed the possibility of a lesser included offense," "Montour agreed to forego a defense focusing on a lesser included offense," and "electing not to argue for the lesser included offense was part of the strategy to which Montour and counsel committed *before* Montour leveled with counsel about his involvement in the shooting."[143] To the extent that factual finding means Montour affirmatively chose not to pursue the lesser-included offense *throughout trial* because of an initial conversation with Frost *before* trial, it's clearly erroneous.

The record contains no evidence that Montour affirmatively rejected a lesser-included defense throughout trial. Frost testified that, before trial, Montour elected to decline a plea offer to the lesser-included offense and that she told Montour, in a "hey by the way"-type conversation, that the jury was going to be instructed on that offense.[144] But Frost and Montour didn't discuss the lesser-included offense during trial, let alone discuss pivoting to an argument regarding that offense once it became apparent that Frost's no-show assumption was wrong. The trial court was clear about this: it found that Frost "did not discuss [her] strategy with [Montour] after the trial started."[145] In fact, Frost testified twice that she and Montour "never" "discuss[ed] the trial strategy and whether it might need to change."[146] Thus, Montour couldn't and didn't "forgo a defense focusing on a lesser included offense"—there was no mid-trial conversation in which such a decision was discussed, let alone made. In holding that Frost reasonably could pursue her all-

---

[143] App.26 (second quotes), 28 (third quote), 29 (first quote) (emphasis added).
[144] R.39:784.
[145] App.10.
[146] R.39:783, 785.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

or-nothing theory because "Montour agreed to forego a defense focusing on a lesser in-cluded offense," the Wisconsin court's decision rests on an unreasonable factual finding.

**2.      The court unreasonably applied *Strickland* when denying relief.**

The Wisconsin appellate court's ruling also receives no AEDPA deference because that court unreasonably applied *Strickland*. Under § 2254(d)(1), a state court unreasonably applies clearly established law when it "identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000). Here, the court held that Frost acted "strategically" in pursuing her all-or-nothing approach throughout trial, even when it was clear it wouldn't succeed, and that Montour was to blame for its failure. That ruling is an unreasonable application of *Strickland* three times over.

a.      First, the Wisconsin court unreasonably applied *Strickland* when it recast Frost's approach to the case as "strategic." In *Strickland*, the Supreme Court explained that "[c]ounsel may not exclude certain lines of defense for other than strategic reasons." 466 U.S. at 681. And so-called "strategy" calls must be reasonable. *Id.* at 690–91. Importantly, a state court reviewing a *Strickland* claim cannot "label a decision 'strategic' and thereby immunize it from constitutional scrutiny." *Jones v. Calloway*, 842 F.3d 454, 464 (7th Cir. 2016). Rather, "the decision must be—in fact—strategic." *Dunn*, 981 F.3d at 591. And "[a] tactical decision based on a complete misunderstanding of an essential piece of evidence does not equate to strategy." *Id.* at 594. Here, Frost's approach was anything *but* strategic and reasonable.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

As highlighted above, Frost's all-or-nothing approach was premised on an *assumption* that the witnesses wouldn't testify against Montour, and that assumption was neither reasonable nor strategic. Every reasonable attorney would believe that witnesses on probation and serving as confidential informants will appear at trial. And, regardless, every fairminded jurist would agree that every reasonable attorney would prepare a plan in case the witnesses *did* appear. Frost did neither. Any early indications Frost had that the State's witnesses wouldn't appear were thoroughly dispelled before trial began. And yet, even when Kruizenga was sitting in the front row of the courtroom, Frost still assumed that he (and all the other key witnesses) wouldn't testify. That assumption so consumed her approach to the case that she didn't thoroughly interview her own client; nor did she seek a continuance. Put differently, her "mistaken belief" that the witnesses wouldn't appear "infected [her] trial strategy to such an extent that [her] approach to" the case "cannot be reasonably viewed as strategic, even with the heavy measure of deference afforded [her] under *Strickland*." *See Dunn*, 981 F.3d at 592 (internal quotation marks omitted). Plan-continuation bias is not an objectively sound, strategic judgment call.

Equally, Frost's decision to maintain the all-or-nothing theory that Montour "did not do this thing," even after multiple witnesses testified that they saw him do this thing, wasn't a strategic choice. Pivoting to argue for the lesser-included offense "never even crossed [her] mind." This Court has explained that unconscious choices, like that one, are not "strategic." For that very reason, in *Woolley v. Rednour*, this Court held that counsel's decision not to retain an expert wasn't "strategic" where "the idea of securing an expert witness 'never crossed [his] mind.'" 702 F.3d 411, 423 (7th Cir. 2012). Similarly, in *Thomas*

35

*v. Clements*, the Court held that counsel's decision not to consult with an expert wasn't "strategic or tactical" where he simply "did not think to do so." 789 F.3d 760, 768 (7th Cir. 2015). In Frost's own words, that's precisely what happened here.

Further, Frost's inability to explain her litigation choices is telling. This Court has held that counsel performs deficiently, not strategically, where he offers no "objectively sound reason" for not pursuing a course helpful to his client. *See Jones*, 842 F.3d at 465–66. Here, in describing why she didn't pursue any argument regarding the lesser-included offense, Frost cited exhaustion, "tunnel vision," and that "there was no more room in [her] brain to think about anything" other than her original approach.[147] None of those is an "objectively sound reason" for forgoing an argument for the lesser-included offense. The Wisconsin court unreasonably applied *Strickland* in slapping a "strategic" label on Frost's non-tactical choice.

b.      Second, the Wisconsin court unreasonably applied *Strickland* when it endorsed Frost's performance without consulting, and in contravention of, contemporaneous professional standards. As noted above, under *Strickland*, the "reasonableness" of counsel's representation turns on an assessment of her performance under "prevailing professional norms," which can be gleaned from sources like the ABA Standards for Criminal Justice. 466 U.S. at 688. When applying *Strickland*, the Supreme Court repeatedly has cited to the ABA Standards for Criminal Justice as a "guide[] to determining what is reasonable." *Id.* at 688; *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003) (citing ABA

---

[147] *Id.* at 781–82, 785, 810.

Federal Defender Services
of Wisconsin, Inc.

Guidelines for the Appointment & Performance of Counsel in Death Penalty Cases 11.4.1(C); 1 ABA Standards for Criminal Justice 4-4.1); *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1). Yet, the Wisconsin Court of Appeals invoked *not one* professional norm—from the ABA or any other source—with which it believed Frost's performance complied.

In fact, Frost's performance *contradicted* prevailing norms for criminal defense attorneys. The ABA Standards demanded that she investigate the case, including interviewing her own client in a way that allowed her to learn all the relevant facts and develop an informed defense theory. And, importantly, she had to be prepared to pivot if new information came to light.  But that's not what she did:

| Prevailing Professional Norm | Frost's Performance |
|---|---|
| Investigate by interviewing the client thoroughly to "determine in depth [his] view of the facts"[148] | Frost didn't interview Montour thoroughly before trial to learn all the facts he knew about the case. |
| Encourage a client's candid disclosure and don't try "to maintain a calculated ignorance"[149] | Frost adopted an all-or-nothing "Montour did not do this thing"-theory without ever asking Montour the questions required to know whether an affirmative defense was possible or he had diminished mens rea. |
| "Refine or alter" the defense theory of the case as necessary as the matter progresses"[150] | After multiple witnesses testified that Montour had fired the gun and Montour privately admitted the same, Frost refused to adjust her defense strategy. |

---

[148] *Standards for the Defense Function* 4-3.3(b) & (c)(i), 4-4.1.
[149] *Id*. 4-3.3(d).
[150] *Id*. 4-3.7(c).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

As the chart makes plain, this attorney performance was flawed from the outset and deficient by its end. Frost never interviewed her client thoroughly to learn the facts and assess what defenses were available. Instead, she adopted a defense theory based on an assumption that the State couldn't prove its case—not because it didn't have actual proof, but because its witnesses wouldn't appear. And when the witnesses *did* appear and she learned her client *had* fired the gun but lacked the requisite mens rea for first-degree intentional homicide, she refused to argue for the lesser-included offense to try to mitigate the damage. Considering the professional standards in place at the time, it's plain that Frost "took an approach that no competent lawyer would have chosen"; "every fairminded jurist would agree that every reasonable lawyer would have made a different decision." *See Dunn v. Reeves*, 141 S. Ct. 2405, 2410–11 (2021) (per curiam) (cleaned up); *see also, e.g.*, *Atkins v. Zenk*, 667 F.3d 939, 941 (7th Cir. 2012) (when defendant confessed to his counsel the day before his attempted-murder trial began that he had, in fact, stabbed his ex-wife, counsel's first reaction was to suggest that they pivot from an all-or-nothing theory to an argument in favor of the lesser-included offense).

    c.    Third, the Wisconsin court unreasonably applied *Strickland* when it blamed Montour for Frost's failings. The court criticized Montour for Frost's approach to the case, asserting that "the strategy issues arose because Montour belatedly informed his counsel that he was the shooter."[151] But the Sixth Amendment's promise of effective representation is premised on "*counsel's* playing a role that is critical to the ability of the adversarial

---

[151] App.29.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

system to produce just results." *Strickland*, 466 U.S. at 685 (emphasis added). The responsibility to execute a case strategy sat squarely on Frost's shoulders. She had the "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process"—and that meant she needed to interview her client to learn the facts of the case and develop an informed strategy. *See id.* at 688; *see also Standards for the Defense Function* 4-4.1. By shifting the blame to Montour for the "strategy issues" that Frost encountered, the Wisconsin court turned those principles on their head. To blame Montour is simply to scapegoat the person who Frost was bound to counsel and defend.

It warrants underlining that Frost's failure to pivot, mid-trial, also wasn't due to anything Montour did or didn't do. This is not a situation in which the client's testifying preference made it impossible for his counsel to pursue a mitigating defense; nor one where the client insisted on an "all or nothing" strategy over counsel's suggestion that they argue, instead, for the lesser-included offense. *Cf. Atkins*, 667 F.3d at 942, 945–46. In fact, it was Montour who alerted Frost to the problem and insisted that they reevaluate their strategy in order to mitigate the damage. Yet, Frost did nothing. *See Jones*, 842 F.3d at 465–66 (defense counsel performed deficiently where he refused to put on witness whose testimony he knew was helpful and defendant had "asked him to call [that witness]"). Regardless of whether Frost thought it prudent for Montour to testify, she could have argued for the lesser-included offense in closing. Every fairminded jurist would agree that there was ample time for Frost to perform effectively, and she didn't do so.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

\*      \*      \*

For any one of these five reasons, the Wisconsin appellate court's ruling was unreasonably wrong. In finding that Frost's performance was acceptable, the appellate court cited a credibility assessment that Frost never made and a categorical rejection of a lesser-included defense theory that Montour never endorsed. What's more, the court merely cited, rather than reasonably applied, *Strickland* when it labeled Frost's assumption "strategic," failed to assess her performance against any professional standard, and blamed Montour for the outcome. The court's reliance on each unreasonable factual finding and its misapplication of *Strickland* makes its decision "not reasonable" five times over; "by definition," it receives no AEDPA deference. *See Dunn*, 981 F.3d at 593 (first quote); *Ben-Yisrayl*, 540 F.3d at 549 (second quote).

**B.      The law and justice require finding that Frost's performance was objectively unreasonable.**

It follows from the discussion above that Frost's performance can't pass *Strickland*'s reasonableness test. Only a few points require further elaboration to underline why the "law and justice require" that the Court find Frost's performance was deficient. *See* 28 U.S.C. § 2243. The law of this Circuit, interpreting and applying *Strickland*, reinforces that Frost's failure to pivot was objectively unreasonable. And justice demands that this Court label Frost's performance as such to avoid harming the integrity of both attorney-client relationships and judicial proceedings.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### 1.    Frost's failure to adjust course was objectively unreasonable.

Time and again, the Supreme Court and this Court have explained, defense counsel has an obligation to reassess her approach when the litigation landscape doesn't match her expectations. Trial proceedings are not scripted plays; counsel must be prepared to pivot before and during trial, as needed. For example, the Supreme Court explained, counsel performed deficiently when he didn't have sufficient court-ordered funds to pay for a qualified expert, didn't research the possibility of (or request) additional funding, and proceeded to trial with an expert "that he himself deemed inadequate." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (per curiam). Similarly, this Court held that counsel performed deficiently where "the State's indication that it was shifting its position on the location of the gunshots would have alerted any reasonable attorney to the need to rebut with a defense expert," yet counsel failed to retain an expert. *Woolley*, 702 F.3d at 423. And it has held that counsel performed deficiently where he made an unreasonable assumption about key testimony, "based his strategic decisions" on that assumption, "had no Plan B" for when his "unlikely strategy blew up," and "remained nearly passive in the face of damning testimony." *Dunn*, 981 F.3d at 592–93. After all, "[t]he spectrum of counsel's legitimate tactical choices does not include abandoning a client's only defense in the hope that a jury's sympathy will cause them to misapply or ignore the law." *United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). And for that reason, the Court also has held that counsel performs deficiently by pursuing an "all-or-nothing approach" that leaves his client "with no defense at all." *Id.* at 803–05.

41

That sequence is what happened here. Frost based her approach to the case on an assumption about key fact witness testimony—that there would be none. That assumption itself was unreasonable, given the clear indications that Frost had that the witnesses would appear at trial. And she had no Plan B for when that unreasonable assumption was upended. After multiple witnesses testified that Montour was the shooter, every reasonable attorney would have been alerted that an all-or-nothing "Montour didn't do this thing" theory, unsupported by any evidence, wouldn't work. Yet, Frost persisted with that approach, remaining nearly passive in the face of damning testimony. By forgoing any argument on the lesser-included offense, Frost abandoned Montour's only viable defense—that he lacked the requisite mens rea to have committed attempted first-degree intentional homicide. Her performance left him with no defense at all.

There's also no doubt that Frost could have presented an argument on the lesser-included offense without undermining her credibility before the jury. The defense had reserved opening argument. At the point when Frost should have known to change tactics, the jury still had not heard an all-or-nothing defense theory of the case. Nor was that theory leaked through Frost's cross-examinations of the State's witnesses—indeed, her questions didn't even suggest that was the defense. *See, e.g.*, *Thomas*, 789 F.3d at 769–70 (counsel's cross-examination, which served "only [to] reconfirm[]" the State's evidence, didn't fill the gap created by his deficient performance). In other words, because Frost had not advanced any defense theory to the jury, there was no risk that the jury would be aware of a mid-trial change in approach, let alone that the defense would lose credibility as a result. In any event, arguing for the lesser-included offense in the alternative

42

presented no credibility risk. Frost could have told the jury that, even if it believed that Montour fired the gun, there was insufficient evidence that he did so with intent to kill or with knowledge that doing so was practically certain to cause death; he couldn't be convicted of the greater offense.

Under the circumstances, pivoting to argue for the lesser-included offense was the only effective move. Attempted first-degree intentional homicide carries a potential penalty of 40 years' initial confinement. Meanwhile, the lesser-included offense of first-degree recklessly endangering safety carries a potential penalty of up to 7½ years initial confinement. Simply put, while Montour currently is serving 20 years on the homicide charge, he could be serving substantially less time if Frost had argued for the lesser-included offense. *See, e.g.*, *Bridges v. United States*, 991 F.3d 793, 807 (7th Cir. 2021) (counsel may have performed deficiently where his error caused the low end of the Guidelines range to "almost triple[]"). In fact, Frost's deficient performance caused Montour's sentence on the homicide charge to almost triple.

### 2. To endorse the Wisconsin court's ruling would be to bless incomplete attorney-client communication and fraud on the court.

The broken communication that Frost had with Montour warrants emphasis. It was Frost's responsibility to identify and pursue a defense in consultation with her client, having investigated all reasonable leads or reasonably declined to go down perceived rabbit trails. *See Strickland*, 466 U.S. at 680–81; *Standards for the Defense* 4-3.3(b) & (c)(i), 4-3.3(d), 4-4.1(a). Indeed, this Court has explained that the Sixth Amendment demands that counsel investigate witnesses who are known to the defense. *E.g.*, *Stanley v. Bartley*, 465

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

F.3d 810, 813 (7th Cir. 2006) (counsel performed deficiently when he failed to interview key witnesses); *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987) (same). No different rule applies to clients; communicating with one's client *is* a form of investigation—oftentimes, the most important form.

Given the complaint's allegations, it should've been plain to Frost that, if the State's witnesses appeared, then the key questions for the jury were who fired the gun and what was he thinking when he did so. In this context, without asking Montour to rehash all the details of that night, Frost had no way of intelligently assessing the available defenses. Was Montour even at the bar, or was this an alibi case? If Montour was there and shots were fired, did he pull the trigger? If he did, then was this a case about self-defense or duress? If no affirmative defense was available, then was this a case where Frost had to argue for the lesser-included offense based on diminished mens rea? In order to understand the State's case and evaluate how best to defend against it, Frost needed to ask *all* these questions. Yet Frost declined to have a candid conversation with Montour until mid-trial—and only then at Montour's prompting.

To bless this representation is contrary to the interests of justice. It would encourage counsel to selectively interview their clients so that they may make ostrich-like representations at trial. And it further risks suggesting that counsel can proceed, as a matter of "strategy," in continuing to make a factual misrepresentation to the court even after they learn it is false. This Court has labeled that practice "troubling." *Atkins*, 667 F.3d at 946. Indeed, it is precisely what the ABA Standards say is unacceptable: counsel neither may "seek to maintain a calculated ignorance" in her attorney-client communications nor

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"knowingly make a false statement of fact . . . to a court." *Standards for the Defense Function* 4-3.3(d), 4-1.4(b). Neither attorney-client relationships nor judicial proceedings are best served through subterfuge. The interests of justice demand better. To avoid any repeat occurrence, this Court must label Frost's performance for what it was: constitutionally deficient.

## II.    Frost's deficient performance prejudiced Montour.

The Wisconsin Court of Appeals expressly declined to reach the second prong of the *Strickland* test, which leaves it to this Court to review that issue de novo. *See, e.g.*, *Dunn*, 981 F.3d at 591. As set out below, "law and justice require" that this Court find there is a reasonable probability that, but for Frost's performance, Montour's trial would have ended differently. *See* 28 U.S.C. § 2243.

Its beyond peradventure that closing argument matters. "The right to effective assistance extends to closing arguments," and those arguments should "sharpen and clarify the issues for resolution by the trier of fact." *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam). Indeed, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. . . . [N]o aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring v. New York*, 422 U.S. 853, 862 (1975). In the absence of closing argument, the jury is missing a central piece of advocacy.

Closing argument mattered here, because a conviction on attempted first-degree intentional homicide was far from certain. As the State itself acknowledged in its briefing

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

before the district court, "there was already evidence for the jury to consider Montour's guilt on the lesser included offense, including evidence that Montour fired the weapon low and into the ground."[152] In fact, the detective had testified that lethal force is aimed at "center mass." The defense investigator had testified that the damage to the bar's back door was just inches off the ground. Adrian had testified that the gun *wasn't* pointed directly at him. And Kruizenga had testified that his lower leg was injured, with so superficial a wound that he didn't have to seek medical attention. Indeed, the lesser-included instruction was given at the State's request and *because* of that evidence.[153] The State rightly was concerned that jurors might not agree that Montour had the requisite mens rea to commit attempted first-degree intentional homicide.

If Frost had linked up the evidence with the elements, then there is a reasonable probability of a different outcome. What the jury needed was a simple visual:

| 1st-Degree Recklessly Endangering Safety | Evidence |
|---|---|
| Defendant "was aware that his conduct created the unreasonable and substantial risk of death or great bodily harm"[154] | *Detective*: Someone with intent to use deadly force aims at "center mass" <br><br> *Adrian*: "I don't think it [the gun] was pointed directly at me." <br><br> *Firearms analyst*: Bullets "go in a straight line from whatever direction the barrel is pointed" <br><br> *Exhibit 78*: Bullet damage to back door was just inches off the ground <br><br> *Exhibit 15*: Kruizenga had a superficial wound to his lower leg that didn't require medical attention |

---

[152] R.58:34.

[153] *Id.* at 33; R.39:681–82, 692–95.

[154] R.39:701.

Federal Defender Services of Wisconsin, Inc.

Armed with a chart like that, Frost could have persuasively argued that the State's evidence aligned with recklessness, not intent to kill. Indeed, as the defense sketched out at greater length before the district court, an amended closing argument is easy to construct.[155] The key rhetoric would have been:

> If you decide that Mr. Montour shot that gun, then think carefully about the difference between intentional homicide and recklessly endangering safety. They are different. Someone who knowingly fires a gun at the ground doesn't intend to kill; bullets aimed at the ground aren't practically certain to cause death. The State didn't prove that the shooter committed attempted first-degree intentional homicide.

But the jury heard no such thing. Missing from their review was any argument why the evidence supported, at most, a finding of recklessness. In fact, the only reference jurors heard to the lesser-included offense was the State telling them to ignore it.

Contrary to the district court's view, the fact that the jury heard all the evidence and was instructed on the lesser-included offense doesn't change the calculus.[156] Without a closing argument that addressed the lesser-included offense's elements, the jury was left without a "basic element of the adversary factfinding process." *See Herring*, 422 U.S. at 858. This Court "presume[s] that the jury [i]s not already schooled in distinctions between" offenses "or even the general concept of lesser-included offenses." *Falconer v. Lane*, 905 F.2d 1129, 1137 (7th Cir. 1990). Indeed, Frost's conversation with the jurors after trial in this case bolsters the appropriateness of that presumption. Three jurors explained

---

[155] R.61:19–20.
[156] *Cf.* App.44–45.

to Frost that they were confused during deliberations—they didn't "understand the difference between the two different offenses," so they "just picked one."[157] And, in demonstrating prejudice, Montour "need only establish reasonable doubt in the mind of at least *one* juror." *See Dunn*, 44 F.4th at 704 (emphasis added).

The district court's hypothetical "counterargument" for the State doesn't move the needle, either. The court noted that the State could have emphasized Kruizenga's and Adrian's recollection that Montour shot "directly at them."[158] In fact, though, Adrian testified that the gun *wasn't* "pointed directly at [him]."[159] And, regardless, the jury would have had to weigh Kruizenga's testimony against the prosecutor's concession that "panicked people" have imperfect recall, as well as the physical evidence that the shooter aimed low, not at "center mass." *E.g.*, *Jones*, 842 F.3d at 465 (defendant demonstrated *Strickland* prejudice, despite two eyewitnesses' inculpatory testimony, where physical evidence contradicted their testimony). The jury also would have had to compare the pathologist's statement that bullet wounds to extremities "*could* be *potentially* lethal" (or could "be a flesh wound," *McAfee v. Thurmer*, 589 F.3d 353, 355 (7th Cir. 2009)) with the law's demand that a person convicted of first-degree intentional homicide acted in a way he knew "was *practically certain* to cause" death.

Frost's deficient performance prejudiced Montour. There is a reasonable probability that, had Frost marshalled the evidence to the jury and made an argument regarding

---

[157] *See* R.48:1102.
[158] *See* App.46.
[159] R.39:303–04.

the lesser-included offense, "at least one juror would have harbored a reasonable doubt about whether" Montour had the requisite mens rea for attempted first-degree intentional homicide, rather than just picking it. *See Buck v. Davis*, 137 S. Ct. 759, 776 (2017). In other words, Frost's silence affected the outcome. *See, e.g., Jones v. Zatecky*, 917 F.3d 578, 583 (7th Cir. 2019) (defendant prejudiced by counsel's failure to raise meritorious argument). Had she made the argument, there is a reasonable probability that the jury would have convicted Montour of the lesser-included offense and his sentence would be significantly shorter.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## CONCLUSION

The Sixth Amendment doesn't guarantee the best representation, but it does ensure effective representation. This case involves an attorney who didn't communicate with her client about the key facts in the case, made an unreasonable assumption about how trial would unfold, failed to form a back-up plan, and then refused to adjust course when her unreasonable assumption was upended and her defense theory undermined. As a result, there is a reasonable probability that Montour now stands convicted of an offense he didn't commit, rather than the lesser-included offense he did commit, and is serving a prison term almost three times longer than he otherwise might. Frost wasn't effective, and Montour suffered as a result.

To endorse what happened here would be to lower *Strickland*'s chalk line on *Gideon*'s promise; it would move the marker on what is constitutionally sound. The Sixth Amendment demands more than what Montour received from Frost. Therefore, Montour respectfully asks this Court to reverse the judgment under review and order the district court to grant his petition for a writ of habeas corpus under 28 U.S.C. § 2254.

Respectfully submitted,

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger
   *Counsel of Record*
FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, WI 53703
(608) 260-9900
jessica_ettinger@fd.org

*Counsel for Tyler Montour*

50

**CERTIFICATE OF COMPLIANCE AND SERVICE**

Counsel for Tyler Montour certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Circuit Rule 32(c), because it contains no more than 14,000 words, excluding the parts of the document exempt by Federal Rule of Appellate Procedure 32(f). Specifically, the brief contain 12,616 words, as counted by the word-count feature of Microsoft Word.

Counsel further certifies that this document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), as modified by Circuit Rule 32. This document has been prepared in a proportionally spaced typeface using Book Antiqua, 12-point font (and 11-point footnotes), in Microsoft Word.

On this 14th day of December, 2022, the forgoing document was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system, which will provide electronic service on all counsel of record.

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger
*Counsel for Tyler Montour*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel for Tyler Montour certifies that all the materials specified in Circuit Rule 30(a) and (b) are included in the Short Appendix that is attached to this brief.


Date: December 14, 2022          */s/ Jessica Arden Ettinger*
                                    Jessica Arden Ettinger

                                    *Counsel for Tyler Montour*

**SHORT APPENDIX**

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# INDEX TO SHORT APPENDIX

**Starting Page**

A-1: Corrected Judgment of Conviction, December 1, 2015 ........................................App.01

A-2: Oral Ruling, Walworth County Circuit Court, March 1, 2017 ...........................App.04

A-3: Order, Wisconsin Court of Appeals, August 15, 2018 .........................................App.23

A-4: Order, Wisconsin Supreme Court, December 11, 2018 .......................................App.30

A-5: Decision and Opinion & Order, E.D. Wis., July 21, 2022 ....................................App.31

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

A-1

State of Wisconsin vs. Tyler A. Montour

Date of Birth: 05-13-1990

**Judgment of Conviction**

Corrected

Sentence to Wisconsin State Prisons and Extended Supervision

Case No. 2015CF000219

<span style="color:red">**FILED**
**12-01-2015**
**Walworth County**
**Clerk of Circuit Court**</span>

The defendant was found guilty of the following crime(s):

| Ct. | Description | Violation | Plea | Severity | Date(s) Committed | Trial To | Date(s) Convicted |
|---|---|---|---|---|---|---|---|
| 1 | [939.32(1)(a) Attempt (Crime with Life Imprisonment Penalty is Guilty of Class B Felony)] | | | | | | |
| | 1st-Degree Intentional Homicide | 940.01(1)(a) | Guilty | Felony A | 06-12-2015 on or about June 12, 2015 | Jury | 09-30-2015 |
| 2 | Possession of Firearm by Felon | 941.29(2) | Guilty | Felony G | 06-12-2015 on or about June 12, 2015 | Jury | 09-30-2015 |

**IT IS ADJUDGED** that the defendant is guilty as convicted and sentenced as follows:

| Ct. | Sent. Date | Sentence | Length | Agency | Comments |
|---|---|---|---|---|---|
| 1 | 11-24-2015 | State Prison w/ Ext. Supervision | 30 YR | | THE DEPARTMENT OF CORRECTIONS SHALL DEDUCT RESTITUTION AND ALL OTHER COURT OBLIGATIONS AT THE RATE OF 25% OF ALL MONIES RECEIVED WHILE INCARCERATED. |
| 2 | 11-24-2015 | State Prison w/ Ext. Supervision | 10 YR | | See count #1. |

**Total Bifurcated Sentence Time**

| | Confinement Period | | | | Extended Supervision | | | Total Length of Sentence | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ct. | Years | Months | Days | Comments | Years | Months | Days | Years | Months | Days |
| 1 | 20 | 0 | 0 | | 10 | 0 | 0 | 30 | 0 | 0 |
| 2 | 5 | 0 | 0 | | 5 | 0 | 0 | 10 | 0 | 0 |

**Sentence Concurrent With/Consecutive Information:**

| Ct. | Sentence | Type | Concurrent with/Consecutive To Comments |
|---|---|---|---|
| 2 | State prison | Consecutive | Consecutive to count #1, Case No. 2015CF000219. |

App.01

**Ex. 2**

CR-212(CCAP), 08/2011 Judgment of Conviction-Sentence to Wisconsin State Prisons and Extended Supervision §§ 972.13, 973.04 & 895.43, 972.15, Chapter 873, Wisconsin Statutes

This form shall not be modified. It may be supplemented with additional material.     Page 1 of 3

000003

121-1

Case: 22-2393     Document: 11     Filed: 12/14/2022     Pages: 114

State of Wisconsin vs. Tyler A. Montour

**Judgment of Conviction**
Corrected

Sentence to Wisconsin State Prisons and Extended Supervision

Date of Birth: 05-13-1990

Case No. 2015CF000219

**Conditions of Extended Supervision:**

**Obligations:**     (Total amounts only)

| Fine | Court Costs | Attorney Fees | ☐ Joint and Several Restitution | Other | Mandatory Victim/Wit. Surcharge | 5% Rest. Surcharge | DNA Anal. Surcharge |
|---|---|---|---|---|---|---|---|
| | 966.00 | | | 26.00 | 184.00 | | 500.00 |

| Ct. | Condition | Agency/Program | Comments |
|---|---|---|---|
| 1 | Costs | | Pay court costs and Department of Corrections Supervision Fees. If the defendant is discharged from Extended Supervision with outstanding financial obligations, a civil judgment may be entered against the defendant and in favor of restitution victims and governmental entities for the balance due. <br> ------------------------------- |
| 1 | Other fees | | Pay Sheriff's fees in the amount of $640.00 <br> ------------------------------- |
| 1 | Firearms/Weapons Restriction | | Possess no weapons. <br> ------------------------------- |
| 1 | Prohibitions | | No contact with known gang members. No contact with Blake Kruizenga, Adrian Valadez, Alex Garnica, or Pedro Gonzalez. No alcohol or illegal drug use or possession. Not to enter Hawk's Nest or other bars, taverns, or liquor stores. <br> ------------------------------- |
| 1 | Other | | Submit DNA sample and pay surcharge. <br> ------------------------------- |
| 1 | Alcohol assessment | | Attend AODA or other assessments as recommended by Agent. <br> ------------------------------- |
| 2 | Costs | | See count #1. <br> ------------------------------- |
| 2 | Firearms/Weapons Restriction | | See count #1. <br> ------------------------------- |
| 2 | Prohibitions | | See count #1. <br> ------------------------------- |
| 2 | Other | | See count #1. <br> ------------------------------- |
| 2 | Alcohol assessment | | See count #1. <br> ------------------------------- |

**Pursuant to §973.01(3g) and (3m) Wisconsin Statutes, the court determines the following:**

The Defendant is ☐ is not ☒ eligible for the Challenge Incarceration Program.

The Defendant is ☐ is not ☒ eligible for the Substance Abuse Program.

**IT IS ADJUDGED** that **160** days sentence credit are due pursuant to §973.155, Wisconsin Statutes

**IT IS ORDERED** that the Sheriff shall deliver the defendant into the custody of the Department.

App.02

Case: 11-99-cv-00600-WCG   Filed 05/17/21   Page 42 of 100   Document 831
CR-212(CCAP), 08/2011 Judgment of Conviction Sentence to WI State Prisons and Extended Supervision §§967.07, 972.13, 973.01, 973.09, 304.074, Ch. 304.74 of Chapter 973, Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.
000004
Page 2 of 3
121-2

State of Wisconsin vs. Tyler A. Montour

**Judgment of Conviction**

Corrected

Sentence to Wisconsin State Prisons and Extended Supervision

Date of Birth: 05-13-1990

Case No. 2015CF000219

**BY THE COURT:**

**Distribution:**

David M. Reddy, Judge
Daniel A. Necci, District Attorney
Melissa Anne Frost, Defense Attorney
Walworth County Sheriff's Department
Walworth County Jail
Department of Corrections - Electronic

Electronically signed by David M. Reddy
Circuit Court Judge/Clerk/Deputy Clerk

December 1, 2015
Date

App.03

CR-212(CCAP), 08/2011 Judgment of Conviction Sentence to State and Extended Supervision §§ 972.13, 973.01, 973.04, 972.51 Chapter 973, Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.     Page 3 of 3

000005

121-3

A-2

FILED
03-13-2017
Walworth County
Clerk of Circuit Court
2015CF000219

```
 1  STATE OF WISCONSIN:     CIRCUIT COURT:      COUNTY: WALWORTH

 2                          BRANCH 3

 3

 4  STATE OF WISCONSIN,      )
                             )
 5          Plaintiff,       )     CASE NO.2015CF219
                             )
 6  -vs-                     )     ORAL RULING
                             )
 7  TYLER A. MONTOUR,        )
                             )
 8          Defendant.       )

 9

10

11

12           THE HONORABLE KRISTINE E. DRETTWAN
                      JUDGE PRESIDING

13

14

15  APPEARANCES

16          ATTORNEY DIANE M. DONOHOO, Assistant District
    Attorney, appeared on behalf of the State of Wisconsin.
17
            ATTORNEY ANN RENE AUBERRY appeared on behalf of the
18  defendant who appeared in person.

19

20

21

22  DATE OF PROCEEDINGS:

23  MARCH 1, 2017

24  KATIE GIEBEL
    COURT REPORTER
25
```

```
 1                       (In open court.)
 2          THE COURT:  Court will call on the record now
 3  15CF219, State of Wisconsin vs. Tyler Montour.  Appearances
 4  please.
 5          MS. DONOHOO:  Diane Donohoo for the State.
 6          MS. AUBERRY:  Attorney Anne Auberry appears on
 7  behalf of Mr. Tyler Montour who is present in court.  Good
 8  morning, Your Honor.
 9          THE COURT:  Good morning.  We are on today for the
10  Court to make its decision with regard to the defendant's
11  postconviction motion for relief requesting a new trial based
12  on ineffective assistance of trial counsel during the jury
13  trial.  I have reviewed the written submissions by both the
14  State and the defense.  Clearly, I heard the testimony during
15  the hearing on December 14th and I have reviewed the file.
16  Is there anything else that the defense wishes to add to their
17  motion or argument at this time?
18          MS. AUBERRY:  No, Your Honor.
19          THE COURT:  Ms. Donohoo?
20          MS. DONOHOO:  Nothing.
21          THE COURT:  Well, as I said, I've reviewed
22  everything here and I'm ready to make my decision.  What I
23  note is that during the evidentiary hearing on December 14th
24  of 2016 both Attorney Melissa Frost and the defendant did
25  testify.  Attorney Frost testified that she has been an
```

Case: 1:19-cv-01604-WCG     Filed: 05/27/21     Page: 43 of 90     Document: 43-9
000843

```
 1  attorney for 17 years, predominantly with criminal defense
 2  work for the prior 10 years.  She has held -- she has been a
 3  part of a number of jury trials, including some very serious
 4  cases, and she has won acquittal.  I know from my own
 5  involvement in the Walworth County criminal justice system for
 6  many, many years now that one of the acquittals that she won
 7  was on a homicide.
 8           Attorney Frost testified, first of all, with regard
 9  to strategy.  She testified that she and the defendant had
10  discussed from the outset that their strategy was that the
11  defendant did not do this crime, that someone else did.  They
12  decided that they wanted to have a speedy trial because the
13  State's witnesses were possibly unavailable, uncooperative,
14  absent, and of unsavory character and the defendant and
15  Ms. Frost felt that the evidence was such in the case that it
16  was a good case to fight at trial.  And so that was their
17  strategy, to have a speedy trial and to deny that he had done
18  this, that the State had the wrong person.
19           She testified that she met with the defendant a good
20  amount of time, especially considering the speedy demand, and
21  that she felt she was prepared for trial.  She testified with
22  regard to strategy that she didn't feel they had enough to
23  file a Denny motion -- and she has filed those in the past --
24  in order to specifically pinpoint another shooter.  So she did
25  not file a Denny motion.  She did not feel it was legally
```

Case: 1:19-cv-01604-WCG   Filed: 05/27/21   Page 34 of 90 Document 34-9
000844

```
1    supported, but she did feel that the defense was good for
2    showing the jury that the defendant did not commit the crime,
3    essentially, that the State would not be able to meet their
4    burden of proof that this defendant committed this crime.
5            And I note she testified that the defendant did not
6    tell her that he was the shooter during any of this
7    preparatory.  It wasn't until -- I think it was after day two
8    of the trial that the defendant -- and this is by his own
9    testimony as well -- stated what he would testify to if he
10   went up as a witness, that he had indeed fired the gun.  So
11   that's important to know.
12           Now the defendant testified that he and Ms. Frost
13   did discuss strategy before the trial and that their strategy
14   was that he did not commit this crime.  He testified that they
15   discussed whether the State's witnesses would be cooperative
16   or even show up and that he never told Ms. Frost that he would
17   testify he was the shooter until after Pedro testified.
18           And the Court, in looking at the transcript and at
19   the minutes from the trial, notes that Pedro was the last
20   witness called by the State on day two and that testimony did
21   end for the day at that point.  And so he told her that the
22   night of day two after the State had presented its witnesses.
23   And I note that Pedro at that point had been given immunity by
24   the State for his testimony.  So that is the evidence that's
25   in the record with regard to the defendant and Ms. Frost
```

1    having a strategy here, what their plan was for trial.

2            Second, I look at -- and I'm trying to address here

3    things that were raised by the defense in terms of potential

4    ineffective assistance of counsel.  A second item that was

5    identified was the offer and whether or not the defendant

6    should have accepted it.  Attorney Frost testified that she

7    conveyed the State's offer to the defendant and that the offer

8    was to plead to the lesser included, the lesser included that

9    was later given as a jury instruction to the jury for

10   deliberation, and that the offer was that the State would

11   recommend ten years.

12           Ms. Frost testified that she discussed this with the

13   defendant and that she did not encourage him to take the

14   offer.  Again, because of what she felt were the strengths of

15   the defense case, which some of them I've already gone

16   through, because of the circumstances of the case with regard

17   to the eyewitnesses being maybe unavailable, uncooperative,

18   concern with regard to the nature of the character of the

19   alleged victims in terms of something to argue to the judge

20   even if he was convicted.

21           She also noted for the defendant, which he had

22   observed firsthand also because of an experience that happened

23   before Judge Reddy with regard to the prosecutor, the

24   prosecutor was the DA at the time, Mr. Necci, and Ms. Frost

25   discussed with the defendant his inexperience and his poor

1  trial skills and the fact that he may very well alienate the

2  jury.  And she noted during her testimony on December 14th

3  that Mr. Necci did live up to her expectations as to how he

4  would perform at trial with regard to that.

5          So for those reasons she did not encourage the

6  defendant to take the offer, but she did tell him, per her

7  testimony, that it was up to him as to whether he wanted to

8  take it or not.  And I note, again, he had not told her he was

9  the shooter at this point.  So the strategy here is he didn't

10  do it.

11          She also testified that they discussed the

12  possibility of his being convicted and that it was maybe a

13  50/50 shot.  There were no guarantees.  She told him that.

14  Now, the defendant testified at the motion hearing that he

15  understood what the offer was and that he rejected it after

16  consulting with Ms. Frost.  He also noted during his testimony

17  that he did not concede that he had a gun that night so he

18  wouldn't take the lesser included because then he would have

19  to concede that he was also a felon in possession of a

20  firearm.

21          He also testified that he was concerned about the

22  State's recommendation to the Court at sentencing and that

23  this was something that he and his attorney had discussed, but

24  that ultimately he chose not to take that offer and he regrets

25  his decision now after having been convicted of a first degree

1    attempted intentional homicide.

2         Another avenue that the defense has identified as

3    potential ineffective assistance of counsel is with regard to

4    Ms. Frost's strategy during the trial itself and whether or

5    not it should have changed midstream.  Ms. Frost testified

6    that she was ready for trial.  There was an issue with regard

7    to some jail tapes, getting them at the very last minute, in

8    fact during the first day of trial, and that that caused her

9    to lose sleep, but she testified that her strategy remained

10   the same during the trial.

11        She made a strategic decision that she would not

12   give an opening statement before the start of the State's case

13   because she did not know who would show up to testify and she

14   did not want to submit to the jury the defendant's story

15   before hearing everything that came out.  That's a smart

16   strategic decision in this Court's opinion.

17        She stated that she did not discuss their strategy

18   with the defendant after the trial started.  She believed that

19   the strategy of -- that he didn't do it should be stuck to.

20   She was concerned that if they changed the strategy midstream,

21   that they would lose.  And at the end of the State's case

22   after Pedro testified, she still believed that sticking with

23   the strategy was reasonable and the best option that they had.

24        Now, the defendant testified during the hearing on

25   December 14th that he felt during the trial that his -- that

1  this strategy was not going to work, but he did not bring it

2  up with his attorney.  He did not discuss it with her and I

3  note that he definitely had the opportunity to.  They both

4  testified that they met the night after day two to talk about

5  whether or not he would testify.  He definitely had the

6  opportunity to talk to her outside of the courtroom to discuss

7  it with her.

8          And I find that he does not seem, during his

9  testimony to me, I did not find him to be shy or the retiring

10  sort of person such that he was incapable of speaking up to

11  his attorney.  To the contrary, I think that the relationship

12  that they had before trial was very open, very communicative,

13  and so I don't find it credible that he just wasn't able to

14  bring that up to her.  He made a choice not to change the

15  strategy and not to talk to her about it.  He could have.

16          Another avenue that the defense questions the

17  effectiveness of Ms. Frost is with regard to whether or not

18  the lesser included jury instruction should have been given,

19  whether it should have been argued against, whether she should

20  have argued for it during closings.  Ms. Frost testified that

21  before the trial she and the defendant discussed the

22  possibility of the lesser included instruction and she noted

23  to him that it would be hard to argue against it and, again,

24  that their strategy was all or nothing.

25          She testified she did not object to the lesser

1    included instruction when it was being discussed during the

2    jury instruction conference and she did not discuss it with

3    him during the trial.  They had already discussed it prior to

4    trial.  And she noted that, again, the strategy here that she

5    and the defendant had agreed on was all or nothing.  And so

6    that was her position with regard to the lesser included jury

7    instruction, why she didn't argue for a lesser during closings

8    and that she wasn't going to argue against it at the

9    conference.

10         Now, the defendant testified -- well, at least he

11   stated in the affidavit that he asks the Court to consider

12   here as part of his case.  In his affidavit he denies that he

13   and Ms. Frost discussed the possibility of a lesser included

14   and now states that he would have taken that option.  He would

15   have wanted that instruction as part of it and he would have

16   wanted it to be argued for.

17         Of course, he's making those comments, first of all,

18   with the benefit of hindsight having been convicted by the

19   jury of the original charge.  And quite frankly, I find that

20   statement to be not credible because it's made with the

21   benefit of hindsight and because I found Ms. Frost to be

22   credible and she testified they did talk about it.

23         So -- and I also keep in mind here that he did not

24   tell Ms. Frost that he was the shooter until the close of the

25   State's case.  So quite frankly, he was playing a game of

Case: 1:19-cv-01604-WCG     Filed: 05/27/21     Page: 50 of 190   Document: 43-9
000850

1   bluff with the jury and even with his own attorney and he

2   can't blame her now for his actions and for what he chose to

3   tell her and when.  It's difficult to be a defense attorney

4   with regard to what you know about what your client did, what

5   they tell you, and what they don't tell you.  It's a very

6   difficult road.  It's almost a balance beam that has to be

7   walked.

8           Another avenue that the defense is pointing out as

9   possible ineffective assistance by Ms. Frost is whether or not

10  he should have testified.  Both parties stated that they

11  discussed on that night of the second day of trial at the

12  close of the State's case whether or not he should testify.

13  And he told her at that point that he would admit his

14  participation and testify, but she advised him not to testify

15  because she felt he would get convicted if he did and that it

16  was contrary.  Testifying that he was involved in it was

17  contrary to the strategy that they had employed and that she

18  had utilized up until that point.

19          Now, I note that Ms. Frost now said during the

20  hearing that maybe they should have talked about it more and

21  she clearly feels poorly and bad that he was convicted, but

22  again, that's with the benefit of hindsight.  She did relate

23  during the hearing what he would have testified to and so

24  clearly she considered that, but again, it was contrary to the

25  strategy and so she advised against him testifying.

1         Plus, I note his admitting that he was

2    participating, he was admitting to firing a weapon, a gun, in

3    the direction of where the victims were standing and that's

4    clearly strong evidence to convict on the charge that he was

5    convicted of, that he was charged with.  So there's definitely

6    a strategic reason for her at that point advising him not to

7    testify.  It flew in the face of everything they had discussed

8    before trial and how the trial was being conducted.

9         Now, the defendant testified in that December

10   hearing that he did engage in the colloquy with Judge Reddy in

11   terms of whether or not he would testify.  I note that

12   according to the transcript and the minutes that this colloquy

13   with Judge Reddy was done during the defendant's case.  I

14   think it was actually done after a couple of witnesses had

15   been called by the defense.  So it was after he had had that

16   discussion with Ms. Frost the night before.

17        He testified in December that it was his free will.

18   It was his choice not to testify and the transcript clearly

19   shows a colloquy between Judge Reddy and the defendant and

20   that it was his choice to make.  Judge Reddy even said during

21   that colloquy that he could revisit his decision after Blake

22   Kruizenga testified again if he so chose and he did not

23   exercise that right to revisit it.  So this was his choice.  I

24   think there's a clear record with regard to his choice not to

25   testify.

1          The legal standard then in terms of whether or not

2     Ms. Frost was ineffective trial counsel for the defendant is

3     that pursuant to *Strickland v. Washington* and our own *State v.*

4     *Pitsch*, P-I-T-S-C-H, the defendant has to show two things.  He

5     has to show that there was deficient performance by counsel

6     and that he was prejudiced because of it.  If the defendant

7     fails to meet one prong of that test, the Court need not

8     consider the other prong.

9          The standard for deficient performance is that are

10    there or were there by counsel acts or omissions under the

11    totality of the circumstances which were outside the wide

12    range of professionally competent legal assistance.  I note

13    that judicial scrutiny here is highly deferential to the

14    decisions that are made by that counsel and the Court is to

15    avoid a determination of ineffectiveness based on hindsight.

16    The Court is to determine was the assistance reasonable under

17    the facts of the case viewed from that perspective at the time

18    that the representation was happening.

19         I note I am to consider were there deliberate trial

20    strategies which fall in the range of professionally competent

21    assistance or was the attorney incompetent.  I note that a

22    lawyer's performance, I am not to find it deficient unless

23    that lawyer made errors so serious that counsel was not --

24    that the lawyer was not functioning as counsel as guaranteed

25    by the Sixth Amendment.  The second prong of the test is the

1    prejudice part and the Court would have to find that there is

2    a reasonable probability that, but for counsel's

3    unprofessional errors, the result would have been different.

4            So when I apply the first prong of this test,

5    meaning was there deficient performance here by Ms. Frost,

6    when I perform -- excuse me, when I apply this standard to

7    Ms. Frost's performance, I do not find that she was

8    ineffective.  She engaged in deliberate trial strategies based

9    on the circumstances, the facts of the case, the discussions

10   that she had with the defendant before trial, and based on her

11   own experience which she has 17 years as an attorney, 10

12   primarily as defense counsel.

13           Some of those facts and circumstances that she was

14   considering and that she talked about with the defendant and

15   that they agreed upon for their strategy, quite frankly, with

16   the -- looking at it from the perspective that they had at the

17   time which is what I am to do, it was a defense attorney's

18   dream, that case before trial.  To have those kinds of

19   witnesses and victims, to be able to discredit, if they even

20   show up, if they're even cooperative with the State.

21           It looked like, at the time, a great case for being

22   able to show reasonable doubt or be able to show that the

23   State cannot make their case beyond a reasonable doubt.  I

24   find that their strategy and her decision to use that strategy

25   as counsel was reasonable given the facts that they knew at

1    the time.  I definitely find it was within the range of
2    professionally competent assistance.
3            She also discussed, and I have already made the
4    findings, with regard to her advice to the defendant before
5    trial to not go with the lesser included.  And again, it was
6    his choice not to although he denies it now in the affidavit,
7    but I have already said I don't find that to be a credible
8    statement.
9            I find that her performance was not ineffective with
10   regard to her advice to him not to testify given the facts
11   that they knew at the time.  And I find that it was his choice
12   not to testify.  He is the one that made that choice
13   ultimately, but her advice to him, looking at it from the
14   perspective of how the case was going at the time and all of
15   those factors, was reasonable and professionally competent
16   assistance.
17           If he would have got up there and testified as I've
18   already said that, yes, he was the shooter and he shot in the
19   direction of those people, that went against their entire
20   trial strategy.  And to change strategy midstream like that is
21   usually not a good idea because then you lose face completely
22   in front of the jury.
23           I also find that she was not deficient in her
24   decision not to argue for the lesser included during her
25   closing argument and not to argue against it during the jury

1   instructions.  This was a strategy that she employed.  She's

2   trying to get the best out of this case that she possibly can

3   and they made the decision they were going for all or nothing

4   and he did not want to take that plea agreement.  It was with

5   her advice, but ultimately it was his decision.  He didn't

6   want the plea agreement and the plea agreement was for the

7   lesser included and he rejected that.  So her performance was

8   not defective.

9         I know that during the trial she expressed -- not

10  during the trial, during the hearing in December -- she

11  expressed her concerns over her performance at trial again and

12  those are in the record.  I don't need to repeat them here.

13  But I would note that trials are not scripted performances.

14  They're not plays that you just have a script that you go by

15  and you know everything that's going to happen and all of the

16  evidentiary concerns and the testimony has been figured out

17  ahead of time.  I wish it were that easy, but it's not.

18        Unforeseen and unforeseeable things happen during

19  trials and the attorneys, whether it's the State or the

20  defense, have to be ready to roll with the punches which I

21  think Attorney Frost did here.  To -- again she clearly feels

22  badly that he was convicted, but looking at her performance

23  from the perspective of when the trial was going on and all of

24  the preparation up until that point, her performance was not

25  deficient.

1          There are things that happen during trials that make

2    you lose sleep.  You might not get a lot of sleep during a

3    trial.  Every trial attorney, whether it's from the

4    prosecution or the defense side, knows that.  You don't always

5    make the greatest decisions during trial.  You might be

6    thinking about it that night and think, oh, I shouldn't have

7    done that or I should have said this or I should not have said

8    this.  Well, that's hindsight.  You're not always perfect.  So

9    I think that to pick apart her performance now given all of

10   the circumstances here is unwarranted.

11         And her self-doubt with regard to how she conducted

12   the trial, it speaks in her favor as a person in terms of

13   questioning her performance because they lost.  But looking at

14   it from the perspective of the trial, no, it's not reasonable

15   to do that.  Her performance was not deficient.  Again, I've

16   already said that to have argued both, he didn't do it, but if

17   he did do it, he didn't shoot to kill during a closing

18   argument would have been conflicting and not -- made them

19   incredible to the jury.

20         I find that just because their strategy didn't work

21   doesn't mean that it wasn't logical, professionally competent,

22   and reasonable.  It was a reasonable strategic decision given

23   the facts and circumstances that were known at the time.  So I

24   do not find that her performance was deficient and I do not

25   find that his Sixth Amendment rights were violated.

1        The Court does not have to consider the other prong

2   here.  The defense has not met their burden of proof with

3   regard to showing deficient performance, but just briefly for

4   the record I'm going to state that, first of all, as I've

5   already found, Ms. Frost did not make unprofessional errors

6   here warranting a finding of deficient performance.  But even

7   if I did, which I don't, I don't think under the second prong

8   there is any reasonable probability -- and the key word there

9   is reasonable -- that the result would have been different if

10  things had been -- things had been done differently during the

11  trial.

12       The evidence in the record supports a conviction of

13  attempted intentional first degree homicide, that he was the

14  shooter, that he shot at the victims, that he hit one of them.

15  And so even if he had testified, even if they had changed

16  their strategy to an admission of a lesser included, number

17  one, he would have been admitting guilt, admitting felon in

18  possession of firearm, so there's a surefire conviction there

19  and that went against their strategy.

20       But even if he had testified, the evidence still

21  would have been he shot in the direction of the victims and so

22  I don't think there's a reasonable probability here that this

23  result would have been anything but an attempted first degree

24  intentional homicide.  The standard for intent is that you

25  acted with the specific purpose to or that you were aware your

conduct could cause that result.  Anyone with half a brain

knows that if you fire a gun in the direction of somebody,

their death could occur, that you are aware that their death

could occur and is probable to occur.

So I don't think that there's a reasonable

probability here that the result of trial would have been

different regardless.  I don't think either prong has been met

and I am denying the motion.  Ms. Donohoo, is there anything

else from the State today?

MS. DONOHOO:  If there is an order to be prepared, I

would ask that the defense prepare it just stating for the

reasons stated on the record the Court denies the motion.

THE COURT:  Ms. Auberry, is there anything else you

would like the Court to address today?

MS. AUBERRY:  No.  I will, in fact, prepare the

motion Ms. Donohoo referred to.  I assume that needs to be

done electronically as of today's date?

THE COURT:  Yes, March 1st.  Thank you for

reminding me.  I say that sarcastically.  All right, thank

you.  We're adjourned.

(End of the proceedings.)

```
 1    STATE OF WISCONSIN     )

 2                           )

 3    COUNTY OF WALWORTH     )

 4

 5

 6

 7            I, Katie Giebel, a court reporter in and for the

 8    State of Wisconsin, hereby certify that the foregoing 18 pages

 9    comprise a true, complete, and correct transcript of the

10    proceedings had at the Oral Ruling held before the Honorable

11    Kristine E. Drettwan, Branch 3, on March 1, 2017, at the

12    Walworth County Judicial Center, Elkhorn, Wisconsin.

13

14            In witness whereof I have hereunto set my hand this

15    12th of March, 2017.

16

17

18                              Katie Giebel(electronically signed)

19                              -----------------------------------

20                              Katie Giebel

21

22

23

24

25
```

A-3

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## August 15, 2018

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.     2017AP573-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CF219

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

v.

TYLER A. MONTOUR,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Walworth County:  DAVID M. REDDY and KRISTINE E. DRETTWAN, Judges. *Affirmed.*

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  A jury convicted Tyler Montour of attempted first-degree intentional homicide and being a felon in possession of a firearm. Postconviction, Montour argued that his trial counsel was ineffective.  After an evidentiary hearing, the circuit court concluded that counsel did not perform deficiently and was not ineffective.   We agree and affirm the judgment of conviction and the order denying Montour's postconviction motion.[1]

¶2     At Montour's jury trial, the victim testified that he and Montour had an encounter in the bar, and the victim saw Montour leave the bar.  Shortly after the victim exited the bar, the victim saw Montour hanging out of the passenger side window of a passing vehicle, Montour yelled an epithet and fired a handgun six or seven times at the victim, wounding the victim in the leg.  Another witness offered testimony similar to the victim's.  The driver of the vehicle testified about Montour's role in the shooting.  Other witnesses presented information supporting the State's theory that Montour was the shooter.  Montour's counsel explored inconsistencies in the witnesses' statements.

¶3     The State requested that the jury be instructed on the lesser included offense of first-degree recklessly endangering safety.  Defense counsel conceded that the lesser included offense instruction was appropriate, even though she would have preferred that the jury not be so instructed.

¶4     At closing, the State argued that Montour was the shooter and urged the jury to convict him of the charged offenses:  attempted first-degree intentional

---

[1] The Honorable David M. Reddy presided over trial and entered the judgment of conviction.   The Honorable Kristine E. Drettwan entered the order denying Montour's posconviction motion.

homicide and being a felon in possession of a firearm. In her closing argument, defense counsel suggested that someone else was the shooter and argued that there was insufficient evidence to convict Montour of the greater crime, attempted first-degree intentional homicide. The jury convicted Montour of the greater crime.

¶5    Postconviction, Montour moved the circuit court for a new trial due to ineffective assistance of trial counsel because counsel should have conceded his role as the shooter and asked the jury to convict him of the lesser included offense, first-degree recklessly endangering safety. Montour contended that he and counsel never discussed the possibility of seeking instructions on a lesser included offense, but had they done so, Montour would have consented to an argument that he acted recklessly rather than with intent to kill when he fired at the victim and other witnesses. Montour claims that he would have agreed to this defense because a number of unbiased citizen witnesses placed him at the bar and stated that he fired the shots. Montour claimed he did not know that he could disagree with counsel about the previously determined "Montour was not the shooter" defense and request that his defense focus on the lesser included offense.

¶6    The circuit court held an evidentiary hearing on Montour's ineffective assistance claim. After hearing testimony from trial counsel and Montour, the circuit court made the following findings of fact about "the circumstances of the case and the counsel's conduct and strategy." *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted). Trial counsel was experienced. From the outset, counsel and Montour agreed that Montour's defense was that he did not fire the firearm. They wanted a speedy trial because they believed that the State's witnesses had credibility issues. Counsel and Montour met and had sufficient time to prepare for a speedy trial.

Case: 19-1940  Document: 11  Filed: 12/14/2022  Pages: 114
000100

¶7    The turning point in the defense came at the conclusion of day two of the trial as the State's case was ending. As he and counsel discussed whether he would testify, Montour admitted to counsel that he had fired the weapon, information not previously shared with counsel during the development of the "Montour was not the shooter" trial strategy. Montour wanted to testify about his involvement in the shooting. Counsel recommended against testifying at trial because his testimony would be at odds with the strategy they had discussed and had been pursuing to that point in the trial. Montour had a colloquy[2] with the circuit court about his decision not to testify.

¶8    The circuit court made the following credibility determinations. The court deemed not credible Montour's claim that he could not discuss trial strategy with counsel; Montour had the opportunity to and was capable of raising his concerns about trial strategy with counsel even before he conceded to counsel that he fired the weapon, which had the potential to upend the defense's trial strategy. The court deemed counsel credible on this issue and found that she and Montour discussed the possibility of a lesser included offense, and Montour agreed to forego a defense focusing on a lesser included offense.[3]

¶9    The circuit court further found that trial counsel's strategy was the same during preparation and at trial: Montour was not the shooter. Once trial started, counsel continued in the previously selected strategy to avoid changing strategy before the jury. Counsel believed that urging conviction of a lesser

---

[2] Montour does not challenge the adequacy of the colloquy.

[3] Montour alleged that prior to trial, trial counsel told him his case "was good as any," there was a "fifty-fifty chance" he could be acquitted of the charged offenses, and a jury would never convict him of the attempted first-degree intentional homicide charge.

included offense would be problematic because the trial strategy had been "all or nothing." Even though the jury was instructed on the lesser included offense, counsel believed that there was no reason to argue the lesser included offense because such an argument would have required abandoning the trial strategy that Montour was not the shooter.

¶10    The circuit court placed great weight on the fact that Montour did not tell counsel he was the shooter until the close of the State's case. The court found that Montour "was playing a game of bluff with the jury and even with his own attorney and he can't blame her now for his actions and for what he chose to tell her and when. It's difficult to be a defense attorney with regard to what you know about what your client did, what they tell you, and what they don't tell you." The court also cogently reasoned:

> I note his admitting that he was participating, he was admitting to firing a weapon, a gun, in the direction of where the victims were standing and that's clearly strong evidence to convict on the charge that he was convicted of, that he was charged with. So there's definitely a strategic reason for her at that point advising him not to testify. It flew in the face of everything they had discussed before trial and how the trial was being conducted.

Finally, after Montour revealed to counsel that he was the shooter, the circuit court engaged him in a colloquy about his decision not to testify. That Montour chose not to testify supports an assessment that Montour was aware of the relevant circumstances and still chose not to testify.

¶11    The circuit court concluded that trial counsel did not perform deficiently and rejected Montour's ineffective assistance claim. Trial counsel had a strategy and made decisions consistent with that strategy and her experience. Given the state of the evidence before trial, including the somewhat shaky witness

Case 1:19-cv-00604-WCG    Filed 05/28/21    Page 25 of 100    Document 34-52    000102

testimony, and Montour's untimely disclosure to counsel that he was the shooter, counsel made a reasonable decision to employ an "all or nothing" strategy throughout the trial. Montour's mid-trial disclosure that he was the shooter would have undermined the defense strategy. In this context, electing not to argue for the lesser included offense was part of the trial strategy to which Montour and counsel committed before Montour leveled with counsel about his involvement in the shooting.

¶12   On appeal, Montour argues that his trial counsel performed deficiently because she did not change the "all or nothing" trial strategy to pursue the lesser included offense option after the jury heard evidence that Montour possessed and fired the firearm.

¶13   To prevail on an ineffective assistance of counsel claim, "a defendant must demonstrate both that (1) counsel's representation was deficient; and (2) this deficiency was prejudicial." *State v. Maloney*, 2005 WI 74, ¶14, 281 Wis. 2d 595, 698 N.W.2d 583. We will not disturb the circuit court's findings of fact unless they are clearly erroneous. *State v. Erickson*, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). However, the determination of whether counsel's performance fell below the constitutional minimum is a question of law we review independently. *Id.*

¶14   "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." *State v. Carter*, 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted). In evaluating counsel's performance, we are highly deferential to counsel's strategic decisions. *State v. Balliette*, 2011 WI 79, ¶26, 336 Wis. 2d 358, 805 N.W.2d 334.

Case 1:19-cv-00604-WCG   Filed 05/17/21   Page 36 of 100   Document 34-52

000103

¶15    As we have stated, we will uphold the circuit court's findings of fact unless they are clearly erroneous.  The circuit court's findings were based on credibility determinations, which were for the circuit court to make.  *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345.   On this record, the circuit court's findings regarding "'the circumstances of the case and the counsel's conduct and strategy,'" *Thiel*, 264 Wis. 2d 571, ¶21 (citation omitted), were not clearly erroneous.

¶16    Applying the law governing deficient performance to the circuit court's findings and considering the foregoing, we conclude that counsel did not perform deficiently.  Trial counsel developed and pursued a strategy that Montour was not the shooter.  Montour chose to pursue that strategy while withholding crucial information that undermined that strategy.  Montour argues that the way the evidence came in necessitated a strategy change.  As is clear from the record, the strategy issues arose because Montour belatedly informed his counsel that he was the shooter. "[A] defendant cannot create his own error by deliberate choice of strategy and then ask to receive benefit from that error on appeal." *State v. Gary M.B.*, 2004 WI 33, ¶11, 270 Wis. 2d 62, 676 N.W.2d 475 (citation omitted).

¶17    On this record, trial counsel did not perform deficiently.  We need not consider whether Montour was prejudiced by trial counsel's performance.  *Maloney*, 281 Wis. 2d 595, ¶14 ("We need not address both components of the inquiry if the defendant makes an insufficient showing on one.").

By the Court.—Judgment and order affirmed.

This opinion will not be published.  *See* Wis. Stat. Rule 809.23(1)(b)5. (2015-16).

Case: 1:19-cv-00604-WCG    Filed: 08/17/21    Page 47 of 100    Document 89-2
000104

A-4



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

**110 EAST MAIN STREET, SUITE 215**
**P.O. BOX 1688**
**MADISON, WI 53701-1688**

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 11, 2018

**To:**

Hon. Kristine E. Drettwan
Circuit Court Judge
P.O. Box 1001
Elkhorn, WI 53121

Hon. David M. Reddy
Walworth County Circuit Court Judge
P.O. Box 1001
Elkhorn, WI 53121

Kristina Secord
Walworth County Clerk of Circuit Court
P.O. Box 1001
Elkhorn, WI 53121-1001

Ann Auberry
Rebholz & Auberry
1414 Underwood Ave., Ste. 400
Wauwatosa, WI 53213

Anne Christenson Murphy
Assistant Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Zeke Wiedenfeld
District Attorney
P.O. Box 1001
Elkhorn, WI 53121

Tyler A. Montour 493870
Green Bay Correctional Inst.
P.O. Box 19033
Green Bay, WI 54307-9033

You are hereby notified that the Court has entered the following order:

No. 2017AP573-CR          State v. Montour  L.C.#2015CF219

A petition for review pursuant to Wis. Stat. §§ 808.10 and (Rule) 809.32(4) having been
filed on behalf of defendant-appellant-petitioner, Tyler A. Montour, and considered by this court;

IT IS ORDERED that the petition for review is denied, without costs.

Sheila T. Reiff
Clerk of Supreme Court

A-5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TYLER A. MONTOUR,

        Petitioner,

    v.                                    Case No. 19-C-1604

CATHY A. JESS,

        Respondent.

---

**DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS**

---

On September 30, 2015, a Walworth County jury found Petitioner Tyler Montour guilty of one count of attempted first-degree intentional homicide and one count of possession of a firearm by a felon in violation of Wis. Stat. §§ 939.32(1)(a), 940.01(1)(a), and 941.29(2). Montour was sentenced to 25 years of initial confinement and 15 years of extended supervision. The Wisconsin Court of Appeals affirmed his conviction, and the Wisconsin Supreme Court denied his petition for review. On November 1, 2019, Montour filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that his Sixth Amendment right to the effective assistance of counsel was violated because his attorney unreasonably failed to argue for the lesser-included offense of first-degree recklessly endangering safety. Respondent moved to dismiss based on procedural default. Because the issues raised by Respondent's motion and the underlying merits were substantial, the Court appointed counsel. Respondent's motion to dismiss was denied, and the petition is now fully briefed and ready for decision. For the following reasons, the Court will deny Montour's petition for writ of habeas corpus.

**BACKGROUND**

On June 23, 2015, Montour was charged with attempted first-degree intentional homicide and with possession of a firearm by a felon. The charges stemmed from an incident that occurred outside a Walworth County bar in the early morning hours of June 12, 2015. According to the complaint, Montour ran into Blake Kruizenga, Adrian Valadez, and Alex Valadez at the Hawk's Nest Bar in Delavan, Wisconsin. Montour bore some animosity toward Kruizenga and Adrian Valadez. Several years earlier, Kruizenga and Valadez had entered the home of Montour's sister and her husband, Pedro Gonzalez, while masked and armed, threatened them, struck Gonzalez in the head with a gun, and stole some "weed." Though charged with the home invasion robbery and various other crimes relating to the incident, a jury had acquitted Kruizenga of all charges except possession of a firearm by a felon. Dkt. No. 34-9 at 91:08–93:05; 196:05-09. Valadez entered a guilty plea to a theft charge. Dkt. No. 34-9 at 09-10. Montour was angry about the outcome.

While at the bar on June 23, 2015, Montour and Kruizenga briefly exchanged words in the restroom and, shortly thereafter, Montour left. Sometime thereafter, Kruizenga and Adrian Valadez left the bar and were standing outside. At some point, they saw a dark-colored sedan approach, leading them to believe that the driver of the vehicle intended to run them over. Kruizenga claimed that, as the vehicle drove by, Montour was hanging out the window, shouted a racial epithet at them, and fired multiple gunshots in their direction. Adrian Valadez likewise identified Montour as the shooter. As Kruizenga fled the scene of the shooting, he realized that he had been shot in the lower leg, although he did not suffer any serious complications as a result.

At trial, Montour was represented by Attorney Melissa Frost. Frost later testified that, from the outset, she and Montour had determined that they would proceed to trial. That decision was driven, in part, by Frost's belief that the State may have encountered difficulties securing the

cooperation of witnesses.  Frost indicated that, at the time the case was filed, the State had not located Kruizenga, who had violated his probation by going to the bar with known felons.  Frost filed a speedy trial demand, hoping to proceed to trial as quickly as possible and deprive the State of its key witnesses.  There was also reason to believe the State's witnesses had serious credibility problems.  In addition to the home invasion/robbery Kruizenga and Adrian Valadez had committed several years earlier, Kruizenga had nine prior convictions and had lied in his initial statements to his probation officer about his presence at the bar and his companions.  Adrian Valadez was likewise on probation, had five prior convictions, and originally told police that another individual was driving a white car and that Gonzalez and Montour were both passengers.  Gonzalez, as the actual victim of the crimes committed several years earlier by Kruizenga and Valadez, had at least as strong a motive as Montour to shoot at them.  He also had seven prior convictions.  Under these circumstances and given the evidence, Frost adopted a theory of defense that Montour was not the shooter.

Prior to trial, the State made an offer to Montour that in exchange for Montour pleading guilty to the lesser-included offense of first-degree recklessly endangering safety, the State would recommend ten years of initial confinement.  Frost conveyed the offer to Montour but said that their discussion about it was "brief," noting that she indicated they had a strong case for acquittal and that the state court judge may not go along with the State's sentencing recommendation. Ultimately, she did "not encourage him to take the offer."  Dkt. No. 34-12 at 23:14–15.  Frost further stated that she told Montour that this was an exceptional case where "it might actually be better for us if we went to trial and lost at sentencing than if we didn't go to trial and proceeded to sentencing."  *Id.* at 24:1–3.  Montour rejected the State's offer and his case proceeded to trial.

On the morning of jury selection, Frost "still believed that the state's witnesses perhaps were not going to show up." *Id.* at 28:8–9. It became clear early on, however, that the State's witnesses would appear. During *voir dire*, the State noted that Kruizenga was sitting in the front row. And in opening argument, the prosecutor said the State would call Kruizenga, Adrian Valadez, Alex Valadez, and Pedro Gonzalez, the driver of the vehicle from which the shots were fired, to testify. Frost reserved her opening statement until she presented her case-in-chief.

Kruizenga took the stand first. He testified that he saw Montour hanging out the passenger window of a vehicle driving past him, heard him shout a racial epithet, and saw him fire several shots from a black handgun. Kruizenga stated that he was roughly ten to fifteen yards away from Montour when the shots were fired and that he could see down the barrel of the gun. The State then called Adrian Valadez. He corroborated Kruizenga's testimony and testified that he was at the bar when a vehicle drove toward them. Adrian saw Montour in the passenger seat of the vehicle, heard him shout a racial epithet, and witnessed Montour fire several shots in his general direction. Next on the stand was Alex Valadez. Alex corroborated the testimony of Kruizenga and Adrian concerning the confrontation between Montour and Kruizenga, where Kruizenga and Adrian were located during the shooting, and the fact that Montour was not present in the bar when he heard gunshots outside of the bar.

Pedro Gonzalez testified under a grant of immunity. Gonzalez stated that he picked up Montour from the bar and that Montour pointed to Kruizenga and Valadez and asked Gonzalez if he wanted to fight them. With Montour in the passenger seat, Gonzalez began to drive off. But Montour told Gonzalez to take a left down an alley, which took them toward Kruizenga and Valadez. As the vehicle passed Kruizenga and Valadez, Gonzalez heard gunshots coming from his right side, prompting him to quickly drive away. Gonzalez said that it was difficult to testify

against Montour because he had known him for more than ten years, he went to school with him, and Montour was the brother of his girlfriend.

Following the second day of the trial, Frost met with Montour.  Montour told Frost that he wanted to take the stand and testify that he was a participant in the shooting.  Specifically, Montour would have conceded that he was the shooter but that he only intended to scare Kruizenga and Valadez by shooting in their general direction.  Frost "strongly encouraged" Montour not to testify because she believed that, if he did, "the trial was going to be over."  *Id.* at 37:8–10.  Frost indicated that she was still solely focused on the theory that Montour did not commit the crime.

The day after meeting with Montour, Frost gave her opening statement.  Frost stated that the jury would hear from an investigator and from a few witnesses who would "kind of go through again some things that happened that night and some things that may have been said to the police." Dkt. No. 34-11 at 4:17–21.  She emphasized that the defense would be brief.  Frost recalled both Adrian Valadez and Kruizenga, both of whom again testified that they witnessed Montour fire a handgun in their direction.  Montour expressly waived his right to testify.

During the jury instruction conference, the court raised the issue of whether it would be appropriate to instruct the jury on the lesser-included offense of first-degree recklessly endangering safety.  Frost indicated that she did not want the jury instructed on the lesser-included offense, but that she did not have a "solid legal basis or really any legal basis for objecting to it." *Id.* at 65:18–19.  As such, the Court instructed the jury on both attempted first-degree intentional homicide and first-degree recklessly endangering safety.

During closing arguments, the State emphasized much of what it had already demonstrated to the jury through each witness but further remarked that the jury was "not going to need" the first-degree recklessly endangering safety instruction because "you do not fire a handgun at

another human being from ten feet away with any other intention than to kill them." *Id.* at 93:17–25. Frost, on the other hand, stuck with her theory that Montour was not the shooter. In essence, Frost challenged the credibility of the witnesses who had identified Montour as the shooter. She noted the inconsistencies in their stories and argued that Kruizenga and Adrian Valadez had picked Montour as the shooter because they had seen him in the bar earlier that evening. She argued Gonzalez was intimidated by police. Frost did not address the lesser-included offense of first-degree recklessly endangering safety in her closing argument. After deliberating, the jury found Montour guilty of attempted first-degree intentional homicide and possession of a firearm by a felon.

Following sentencing, Montour was represented by Attorney Ann Auberry. Auberry filed a petition for a new trial pursuant to Wis. Stat. § 809.30 and asserted that Frost provided ineffective assistance of counsel by failing to argue in support of the lesser-included offense. In an accompanying affidavit, Montour stated that Frost told him that a jury "would never convict" him on the charge of attempted first-degree intentional homicide and that they never discussed the possibility of pursuing the lesser-included offense. Dkt. No. 34-12 at 73:1–4. The trial court proceeded to hold a *Machner* hearing to further develop these assertions.

At the hearing, Frost criticized her own performance during Montour's trial. She noted that she was not thinking as clearly as she normally would and, at one point, was admonished by the judge in front of the jury. Frost was also asked whether she considered changing her strategy after each of the State's witnesses appeared and testified. In response, Frost stated that she did not and that it "never even crossed [her] mind" to change her strategy and argue for the lesser-included offense. She also indicated that she had never discussed the possibility with Montour. *Id.* at 33:2.

Ultimately, Frost indicated that her strategy was a "bad decision" and that she should have talked to Montour more about the strategy when he indicated his desire to testify. *Id.* at 40:18–20.

The trial court denied Montour's motion. It found that Frost "engaged in deliberate trial strategies based on the circumstances, the facts of the case, the discussions that she had with the defendant before trial and her own experience which she has 17 years as an attorney, 10 primarily as defense counsel." Dkt. No. 34-13 at 13:8–12. The trial court remarked that the case was "a defense attorney's dream" because of the ability to discredit the witnesses and victims, even if they were cooperative with the State. *Id.* at 13:13–20. It also stated that Frost was not deficient by failing to argue for the lesser-included offense. The trial court further noted that the defense was "going for all or nothing" and that Montour chose not to take the plea agreement offered by the State before trial. *Id.* at 15:1–4. The court concluded Frost's performance was not deficient, noting:

> [The case] looked like, at the time, a great case for being able to show reasonable doubt or be able to show that the State cannot make their case beyond a reasonable doubt. I find that their strategy and her decision to use that strategy as counsel was reasonable given the facts that they knew at the time. I definitely find it was within the range of professionally competent assistance.

Dkt. No. 34-13 at 13:21–14:02.

The Wisconsin Court of Appeals affirmed. Dkt. No. 34-5. The Wisconsin Court of Appeals recited many of the trial court's findings and ultimately concluded that Frost did not perform deficiently. *Id.* at ¶ 16. The court noted that Frost "developed and pursued a strategy that Montour was not the shooter" and that Montour "chose to pursue that strategy while withholding crucial information that undermined that strategy," namely, that he was the shooter. *Id.* The Wisconsin Court of Appeals, citing state law, stated that Montour could not "create his own error by deliberate choice of strategy and then ask to receive benefit from that error on appeal." *Id.*

(citing *State v. Gary M.B.*, 2004 WI 33, ¶ 11, 270 Wis. 2d 62, 676 N.W.2d 475 (internal quotation marks omitted)).  Having concluded that Frost did not perform deficiently, the court declined to consider whether Montour was prejudiced.  *Id.* at ¶ 17.  The Wisconsin Supreme Court denied review.

On November 1, 2019, Montour filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  His petition asserts that Frost provided ineffective assistance of counsel by failing to pursue the lesser-included offense of first-degree recklessly endangering safety, which Montour claims was "the only reasonable defense to the charge" of attempted first-degree intentional homicide.  Dkt. No. 1 at 3.  As framed in Montour's briefing, "the issue is whether trial counsel performed deficiently *by failing to argue altogether* for the lesser-included offense."  Dkt. No. 61 at 4 (emphasis in original).

## LEGAL STANDARD

Montour's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, which limits the power of federal courts to grant writs of habeas corpus based on claims that were adjudicated on the merits by a state court.  Under AEDPA, a federal court may grant habeas relief when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" United States Supreme Court decisions, or was "based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315 (2015).

A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite conclusion as the Supreme Court would have on "materially indistinguishable" facts.  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  A state court's decision is an unreasonable application of

established precedent when that state court applies Supreme Court precedent in "an objectively unreasonable manner." *Id.* This is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Montour's sole ground for relief is premised upon ineffective assistance of counsel. "The benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon has having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. If a petitioner fails to make a showing on either component, then the results of the trial cannot be said to be unreliable. *Id.*

To show deficient performance, Montour must demonstrate "that counsel's representation fell below an objective standard of reasonableness" and must take into account the "wide latitude counsel have in making tactical decisions." *Id.* at 688–89 (citation omitted). And this Court's "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To demonstrate prejudice, "[i]t is not enough for [Montour] to show that the errors had some conceivable effect on

the outcome of the proceeding . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the proceeding." *Id.* at 693. Based on the totality of the evidence, Montour must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694–95. Where, as here, a petitioner asserts ineffective assistance counsel in the context of a habeas corpus proceeding, federal courts engage in "doubly deferential review under AEDPA." *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021) (quoting *Wilborn v. Jones*, 964 F.3d 618, 620 (7th Cir. 2020) (internal quotation marks omitted). "Deference is layered upon deference in these cases because federal courts must give 'both the state court and the defense attorney the benefit of the doubt.'" *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

## ANALYSIS

### A. Whether the State Court's Adjudication Was Based on an Unreasonable Determination of the Facts

Montour begins by arguing that the state court made an unreasonable factual finding when it stated that he and Frost "wanted a speedy trial because they believed that the State's witnesses had credibility issues." *Montour*, 384 Wis. 2d 271, ¶ 6. He asserts that this was an unreasonable conclusion because Frost's strategy was not developed on the basis of witness credibility but rather witness *availability*. Montour further argues that the Wisconsin Court of Appeals compounded this error when it relied on the factual finding to assess Frost's performance. *See id.* at ¶ 11 ("Given the state of the evidence before trial, *including the somewhat shaky witness testimony* . . . counsel made a reasonable decision to employ an 'all or nothing' strategy throughout the trial." (emphasis added)).

"A finding of fact . . . is not unreasonable simply because a federal habeas court would have reached a different conclusion." *Hicks v. Hepp*, 871 F.3d 513, 525 (7th Cir. 2017) (internal

citation omitted). Rather, Montour must rebut the Wisconsin Court of Appeals' factual findings by "clear and convincing evidence." *Id.* (internal citation and quotation marks omitted). To support his position, Montour makes much of the fact that Frost repeatedly indicated that she was operating on the belief that the State's witnesses would not show up at trial. But Montour fails to recognize that Frost stated that her belief regarding availability of witnesses was only "part of" her strategy. *Id.* In formulating her strategy, Frost also considered the "nature and character" of the State's witnesses and how she anticipated they may act on the stand in the event the State was able to locate them. Dkt. No. 34-12 at 24:04. True, Frost cited her belief that the State's witnesses would not show up, but there is evidence in the record that also supports the conclusion that Frost's strategy was, at least in part, based on her assessment of the credibility of the State's potential witnesses. As she testified at the postconviction motion hearing, Frost viewed the case as "a great case for trial," a view that the trial court shared. *Id.* at 47:03–04; Dkt. No. 34-13 at 13:21–14:02. Frost noted that her assessment was also based upon her view of the prosecutor's trial skills and his potential for alienating the jury. *Id.* at 47:09–18. Montour has failed to rebut the state court's factual findings by clear and convincing evidence.

## B.  Whether the Wisconsin Court of Appeals Unreasonably Applied *Strickland*

The Wisconsin Court of Appeals' decision describes the trial court's factual findings extensively but provides only a brief analysis of the merits of Montour's ineffective assistance of counsel claim. Its explanation consists of a single paragraph:

> Applying the law governing deficient performance to the circuit court's findings and considering the foregoing, we conclude that counsel did not perform deficiently. Trial counsel developed and pursued a strategy that Montour was not the shooter. Montour chose to pursue that strategy while withholding crucial information that undermined that strategy. Montour argues that the way the evidence came in necessitated a strategy change. As is clear from the record, the strategy issues arose because Montour belatedly informed his counsel that he was the shooter. "[A] defendant cannot create his own error by deliberate choice of

strategy and then ask to receive benefit from that error on appeal." *State v. Gary M.B.*, 2004 WI 33, ¶ 11, 270 Wis. 2d 62, 676 N.W.2d 475 (citation omitted).

*Montour*, 384 Wis. 2d 271, ¶ 16.

It is clear that the Wisconsin Court of Appeals applied *Strickland*. *Id.* at ¶¶ 13–16. Therefore, the only question for this Court to decide is whether the Wisconsin Court of Appeals did so reasonably. In order for the Wisconsin Court of Appeals' decision to be an unreasonable application of *Strickland*, it must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks and citation omitted). Because there are "countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, "the range of reasonable applications [of *Strickland*] is substantial." *Harrington*, 562 U.S. at 105. The question "is not whether counsel's actions were reasonable" but whether there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*[1]

Montour asserts that his trial counsel provided constitutionally ineffective assistance in failing to pursue the lesser included offense of recklessly endangering safety. The Seventh Circuit has recognized that "[s]trategic choices are 'virtually unchallengeable.'" *McAfee v. Thurmer*, 589 F.3d 353 (7th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690). Here, there is a reasonable argument that Frost satisfied the *Strickland* standard. Armed with the knowledge that the State may have difficulty locating its witnesses and that, even if they were located, they may have questionable credibility, Frost and Montour pursued a speedy trial with their theory of defense centered on the idea that Montour was not the shooter. After the State's witnesses appeared and identified Montour as the shooter, Montour disclosed to Frost that he was the shooter but that he

---

[1] *Harrington* also cautions the Court to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." 562 U.S. at 105

only intended to scare, not kill, Kruizenga and Valadez. Faced with this sudden revelation, Frost had to choose whether to make a fundamental change in her trial strategy and argue for the lesser-included offense, nearly guaranteeing that Montour would be convicted, or move forward with her existing theory that Montour was not the shooter and seek acquittal. Believing that the trial would "be over" if Montour testified to his intent, she advised Montour not to exercise his right to testify and continued to pursue the theory that he was not the shooter. Dkt. No. 34-12 at 37:8–10.

Frost's fear that conviction of the charged crimes was likely if the jury concluded Montour was the shooter was not unreasonable. Kruizenga had testified that Montour had fired six to seven shots directly at him. Kruizenga testified that the car in which Montour was riding was only ten to fifteen feet away and he "could see down" the barrel of the gun as Montour shot at him. Dkt. No. 34-9 at 98:04–09. Adrian Valadez likewise testified that there were four to six shots and that he saw Montour point the gun in his direction. *Id.* at 151:15–52:08. True, Frost could have argued that the fact that Kruizenga was struck in the lower leg and that the only bullet recovered appeared to have struck the lower part of the back door to the bar suggests that the shooter was not intending to kill. But the first shots were fired before Kruizenga and Valadez fled back into the bar, and only one bullet and a possible fragment were ultimately found. The investigating officer testified about the difficulties of locating bullets at the scene and of hitting a target from a moving vehicle. Dkt. No. 34-10 at 43:11–19; 60:20–61:13. Given this evidence, it was not unreasonable for Frost to focus in her closing on the State's argument that Montour was the shooter.

This may be a case that, "[i]n hindsight, it might well have been better to urge the jury to convict on the lesser-included offense, rather than go for broke by seeking an acquittal on the more serious charge." *McAfee*, 589 F.3d at 356. But as the court noted in *McAfee*, "we do not second-guess an attorney's performance with the benefit of hindsight. Instead, as *Strickland* dictates, we

make 'every effort . . . to evaluate the conduct from counsel's perspective at the time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). While several witnesses identified Montour as the shooter, Frost did not stand idly by and do nothing to rebut this testimony. During closing arguments, Frost highlighted various inconsistencies in the stories among those who testified, including differences in where the gun was when it was fired, whether Kruizenga and Valadez split up or ran in the same direction following the shooting, what the car looked like, and what color it was. She also emphasized that there was only one individual who testified that wasn't under the influence of alcohol that night. Finally, Frost noted the tension among the victims and Montour, implying that the victims would have had a motive to identify Montour as the shooter based on their prior acrimonious interactions. Her argument "might well have swayed a few jurors and forced a compromise verdict—not guilty of intentional homicide but guilty on the lesser-included offense." *Id.*

Citing *United States ex rel. Barnard v. Lane*, Montour argues that Frost's failure to argue for the lesser-included offense and decision to pursue an all-or-nothing defense left him "with no defense at all." 819 F.2d 798, 803 (7th Cir. 1989). But unlike this case, *Barnard* was not governed by AEDPA. Moreover, in *Barnard*, the defendant was charged with murder, and his trial counsel failed to request a jury instruction on justification and manslaughter, even in the face of the defendant's admission that he shot the victim and the jury's clear reluctance to find the defendant guilty of murder. *Id.* at 803–04. Here, the trial court instructed the jury on the lesser included offense of first-degree recklessly endangering safety and specifically told the jury that it should consider the lesser charge if it was unable to agree on the more serious charge. Montour was not left without any defense. Unlike counsel in *Barnard*, Frost's strategy was not to abandon Montour's only defense "in the hope that a jury's sympathy [would] cause them to misapply or

ignore the law they [were] sworn to follow." *Id.* at 805.  Instead, Frost formulated and persisted with the theory that Montour was not the shooter and presented evidence and closing argument to support that theory—the mere fact that she chose not to highlight the lesser-included offense, which might have undercut her case for acquittal, does not automatically render her performance deficient.

Finally, even if the Court were to conclude that the Wisconsin Court of Appeals unreasonably applied *Strickland* in concluding that Frost's performance was not constitutionally deficient, Montour would still have to establish prejudice.  Because the Wisconsin Court of Appeals did not reach the issue of prejudice, the Court reviews it *de novo*.  *See Dunn v. Jess*, 981 F.3d 582, 595 (7th Cir. 2020).  To demonstrate prejudice, Montour must show, based on the totality of the evidence, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694–95.  "This does not require a showing that counsel's actions more likely than not altered the outcome," but the likelihood of a different result must be "substantial, not just conceivable."  *Harrington*, 562 U.S. at 111–12 (internal quotation marks and citations omitted).

Unlike many other habeas cases involving lesser-included offenses, the jury in this case received instructions on the lesser-included offense and considered it during its deliberations. Thus, the jury could have found Montour guilty of first-degree recklessly endangering safety had it entertained doubt on the more serious charge.  It did not.  Montour argues that, had Frost presented closing argument with respect to the lesser-included offense, there is a reasonable probability that the jury would have instead convicted him of that charge.  To support this argument, Montour asserts that Frost should have summarized the following evidence for the jury during closing arguments: (1) Officer Mair testified that an individual would fire at someone's

"center mass," such as the chest, if he wished to use deadly force; (2) a ballistics expert testified that bullets typically travel in a straight line from whatever direction the barrel is pointed in; and (3) bullet damage found on the back door of the bar was low to the ground and Kruizenga's bullet wound was located slightly above his ankle.  According to Montour, if summarized appropriately during her closing, Frost would have been able to argue that Montour lacked the intent to kill Kruizenga and Valadez because the evidence demonstrated that he fired at the ground, not at Kruizenga or Valadez's center mass. Had the evidence been presented and argued in this way, Montour asserts that there "is a reasonable probability that the jury would have had reasonable doubt regarding the attempted first-degree intentional homicide charge," and the jury would have instead returned a verdict on the lesser-included offense.  Dkt. No. 61 at 20.

But Montour fails to account for the counterarguments that the State could have advanced. For one, the State argued during its initial closing argument that "you do not fire a handgun at another human being from ten feet away with any other intention than to kill them."  Dkt. No. 34-11 at 93:17–25.  Furthermore, Montour's argument ignores the testimony of both Kruizenga and Adrian Valadez that he shot directly at them when they were standing outside the bar and assumes that Montour is an accurate shot.  Because Kruizenga was struck in the lower leg and at least one of the bullets appears to have struck the lower part of the screen door, Montour argues that the jury would likely have found he was aiming low.  But it is just as plausible that Montour missed due to the difficulty of firing a handgun from a moving vehicle as his targets were fleeing into the bar.

Montour also ignores the fact that the jury heard the evidence he wished Frost had summarized.  His argument is essentially that, had Frost offered the argument he now wishes she had given, the jury would have convicted Montour on the charge of first-degree recklessly endangering safety instead of attempted first-degree intentional homicide.  *See* Dkt. No. 61 at 20.

But the jury had all of the evidence he believes it needed to acquit him of attempted first-degree intentional homicide. Put simply, while an argument for the lesser-included offense may raise the *possibility* that the jury would have convicted Montour on that charge, the mere recapping of evidence at closing argument does not create a *reasonable probability* that the jury would have done so. In other words, while it is conceivable that the jury may have chosen to convict Montour on the lesser-included offense, Montour has not shown that the likelihood of a different result is "substantial." *Harrington*, 562 U.S. at 111–12 (internal quotation marks and citations omitted). Therefore, Montour has failed to demonstrate prejudice.

## CONCLUSION

For the foregoing reasons, Montour's petition for writ of habeas corpus (Dkt. No. 1) is **DENIED**. The Clerk is directed to enter judgment dismissing the case. Because reasonable jurists could reach a contrary decision, however, a certificate of appealability will be granted on the issue of whether Montour's trial attorney was ineffective.

Montour is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of July, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge